UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDA J. LEE,                    )
                                  )
          Plaintiff,              )
                                  )
          v.                      )  Civil No. 05-1335 RWR
                                  )
DONALD WINTER, Secretary,         )
United States Navy,               )
                                  )
          Defendant.              )
_____  )

DEFENDANT'S MOTION TO DISMISS AND
FOR SUMMARY JUDGMENT

     Defendant Donald Winter, Secretary of the United States

Department of the Navy, by his undersigned counsel, respectfully

moves the Court, pursuant to Rules 12(b)(1) and 12(b)(6) of the

Federal Rules of Civil Procedure, for an order dismissing certain

of plaintiff's claims in this action on the grounds that the

plaintiff failed to exhaust her administrative remedies regarding

one claim and other claims fail to state a claim upon which

relief can be granted.  In the alternative, and for the remaining

claims, defendant moves the Court, pursuant to Rule 56 of the

Federal Rules of Civil Procedure, for an order granting defendant

summary judgment on the grounds that no genuine issue of material

fact exists and defendant is entitled to judgment as a matter of

law.

     In support of this motion, the Court is respectfully

referred to the accompanying statement of material facts, the

memorandum of points and authorities, the exhibits, and the declarations or testimony of individuals with personal knowledge of the facts in question.  A proposed order is also attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDA J. LEE,                        )
                                     )
          Plaintiff,                 )
                                     )
          5.                         ) Civil No. 05-1335 RWR
                                     )
DONALD WINTER, Secretary,            )
United States Navy,                  )
                                     )
          Defendant.                 )
_____ )

DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), defendant hereby submits his statement of material facts as to which there is no genuine issue:

1. During all times relevant to this case, plaintiff Brenda J. Lee (African American, born 1948) was a GS-343-12 Program Analyst at the Naval Sea Systems Command (NAVSEA) located at the Washington Navy Yard, Washington D.C.  Amended Complaint, ¶ 2. Plaintiff worked in the case development branch (SEA 63IC3) of the Office of International Programs (SEA 63).  Deposition of Brenda Lee (Lee Dep.), attached as Exh. 1, at 22; Administrative Report of Investigation (ROI) Transcript #1 (ROI Tr. #1), attached as Exh. 2, at 5, 131, 134.

2. Plaintiff was responsible for the pre-case development of foreign military sales (FMS) cases in the Defense Security Assistance Management System (DSAMS), which included Letters of

Offer and Acceptance (LOA), requests for Price and Availability (P&A) data, case amendments and modifications.  Amended Complaint, ¶ 11; Exh. 1, Lee Dep. at 22-23.

3.  Plaintiff could not be promoted to the GS-13 level without either obtaining an "accretion of duties" promotion or being selected for a position at a higher grade level through a competitive process.  Exh. 1, Lee Dep. at 21-22.

4.  Plaintiff did not to seek a desk audit.  Exh. 1, Lee Dep. at 37, 40-41.

<u>Accretion of Duties Promotion Claim</u>

5.  On April 30, 2004, plaintiff asked her third level supervisor, Hercules Randolph, Deputy Program Manager of the Office of International Programs during the relevant time period, for an "accretion of duties" promotion to the GS-13 level. Deposition of Hercules Randolph (Randolph Dep.), attached as Exh. 3, at 4-5; Exh. 1, Lee Dep. at 29; Amended Complaint, ¶ 18; Exh. 2, ROI Tr. #1, at 33-34.

6.  Randolph told plaintiff that he could not grant her request.  Amended Complaint, ¶ 18.  He told her that he had been informed that there was a "freeze" on accretion of duties promotions.  Exh. 1, Lee Dep. at 38; Exh. 3, Randolph Dep. at 51.

7.  Randolph advised plaintiff that she could request a desk

2

audit to see if her position could be reclassified at a higher level.  Exh. 2, ROI Tr. #1 at 34; Exh. 3, Randolph Dep. at 68.

8.  Randolph later told plaintiff that even if the desk audit showed that the position could be classified at the GS-13 level, he still could not grant her an accretion of duties promotion because of the restriction on such promotions, but that he would advertise the position and she could compete for it. Amended Complaint, ¶ 20; Exh. 1, Lee Dep. at 39; Exh. 2, ROI Tr. # 1 at 36.

9. Plaintiff decided not to seek a desk audit.  Exh. 1, Lee Dep. at 37, 40-41.

<u>Non-promotion to the GS-13 Claim</u>

10.  During the relevant time period Navy employees could express an interest in a particular type of job, publicized by an "open continuous vacancy announcement," such that if there were an opening in the future, they would have already expressed an interest.  Exh. 1, Lee Dep. at 26-28.  Plaintiff was familiar with "open continuous vacancy announcements."  <u>Id</u>. at 26.

11.  In order to be considered for selection for promotion under the open continuous vacancy announcement system, Navy employees had to place a current resume into the Navy's "resume builder," or "RESUMIX" system.  Plaintiff was familiar with this requirement.  Exh. 1, Lee Dep. at 27-28, 41.

12.  In January 2004 plaintiff was advised that there would be promotional opportunities in SEA 63 and that her resume should be up-to-date in RESUMIX if she had, or might have, an interest in a higher graded job.  Exh. 4, attached.

13.  In April 2004 NAVSEA announced a vacancy for a GS-343-13 Program Analyst to perform case management duties in SEA63IC2. Exh. 5, ROI #1 at 28, 104.

14.  On or about May 19, 2004, the Human Resources Service Center Northwest (HRSC NW) generated selection certificates of qualified candidates for the GS-343-13 vacancy in SEA 63IC2.  One certificate listed those individuals qualified for a competitive promotion to the position.  Exh. 6, attached.  The other certificate listed qualified individuals already at the GS-13 level.  Exh. 7, attached.

15.  Plaintiff's name did not appear on the competitive or noncompetitive certificate generated by HRSC NW on May 19, 2004. Exhs. 6-7; Exh. 1, Lee Dep. at 44.

16.  Raymond Ashenfelder served as the Assistant Program Manager for International Programs Management.  Exh. 5, ROI #1 at 96, 229-230.  Mr. Ashenfelder was the chair of the panel that reviewed the applications of candidates for the GS-343-13 position in SEA 63IC1 that was filled in July 2004.  Deposition

of Donald Seibel (Seibel Dep.), copy attached as Exh. 8, at 31;
Exh. 5, ROI #1 at 230; Exh. 3, Randolph Dep. at 85.

17.   After consulting with Randolph and Ashenfelder,
Captain Theodore Fredrick, the Program Manager for SEA 63,
decided to laterally reassign Kathy Ton, a GS-13, to the GS-343-
13 Program Analyst vacancy in SEA 63IC2.  Exh. 3, Randolph Dep.
at 76, 82-84; Exh. 1, Lee Dep. at 44.

18.  Randolph wanted to promptly fill the vacancy that would
be created in SEA 63IC1 with Ton's reassignment, as the countries
assigned to that position were very important because of
international problems associated with them.  Exh. 3, Randolph
Dep. at 82-84.

19.  Randolph asked one of his subordinates, Carolyn
Lightfoot, to inquire about how the position could be filled
quickly and was advised by Ms. Lightfoot that it was permissible
to use the May 19, 2004 selection certificates to fill the GS-
343-13 vacancy in SEA 63IC1.  Id. at 82.

20.  A panel comprised of three members -- Ashenfelder,
Donald Seibel (plaintiff's first level supervisor) and Fred Kraus
-- evaluated the applications of the qualified applicants for the
SEA 63IC1 position and interviewed them.  Id. at 85; Exh. 5, ROI
#1 at 189.

21.  Thereafter, on or about July 8, 2004, Ashenfelder advised Randolph that the panel recommended Marivic Britton as the best qualified candidate for the position in SEA 63IC1.  Exh. 5, ROI #1, at 108, 189; Exh. 3, Randolph Dep. at 85.

22.  Britton is a younger, white employee with no prior EEO activity.  Amended Complaint, ¶ 19.

23.  Ashenfelder briefed Randolph on the panel's findings and forwarded to him the selection package, including the selection certificates.  Exh. 3, Randolph Dep. at 85; Exh. 5, ROI #1 at 189.

24.  Randolph selected Ms. Britton for the vacancy in SEA 63IC1 on July 13, 2004.  Exh. 3, Randolph Dep. at 85; Exh. 9.

25.  Plaintiff submitted her resume to the Navy's resume builder (i.e., RESUMIX) for the first time on or about September 23, 2004.  Declaration of Catherine Sergeson, attached as Exh. 10.

<u>Assignment of Duties Claim</u>

26.  Plaintiff believed that she had the heaviest workload and asked that some of her work be redistributed to the other analysts.  Exh. 1, Lee Dep. at 64-65.  On or about March 24, 2005, Robert Bussink, Assistant Program Manager for International Policy and Financial Management during the relevant time period, and plaintiff's second-level supervisor, met with Seibel and the

6

four analysts, including plaintiff, and asked for input on how to best redistribute the work. Deposition of Robert Bussink (Bussink Dep.), attached as Exh. 11, at 5, 9, 29; Exh. 1, Lee Dep. at 65; Exh. 12, ROI #2 at 135. Bussink told them that a workload analysis showed that plaintiff had the heaviest workload. Exh. 1, Lee Dep. at 65.

27. Plaintiff volunteered to relinquish responsibility for a number of "small" countries that "did not have much work associated with them." Exh. 1, Lee. Dep. at 65. The 12 countries initially proposed by plaintiff included Korea. Id. at 66-67; Exh. 12, ROI #2 at 133-134. Plaintiff subsequently advised Seibel she wanted to continue to handle Korea. Exh. 1, Lee. Dep. at 67. Plaintiff's recommendation was subject to Seibel's approval. Exh. 1, Lee Dep. at 67-68.

28. Seibel ultimately decided that, in addition to the 11 countries proposed by plaintiff, he would redistribute Korea, Australia and Egypt from plaintiff to other analysts. Exh. 8, Seibel Dep. at 112-114. Seibel believed that merely redistributing the countries proposed by plaintiff would not sufficiently lighten her workload and give her the opportunity to better manage her cases. Id. at 126-27. Seibel decided to redistribute responsibility for Australia, Korea and Egypt, because these countries in general had either a high volume of

7

work associated with them, were more complex to process, or were high visibility countries.  Id. at 106-107, 126-127.

29.  After the redistribution of countries took effect, plaintiff continued to perform all of the same functions of her position as she had performed previously.  Exh. 1, Lee Dep. at 86-87.  She continued to process LOAs, requests for P&A data, modifications and amendments for the countries to which she was assigned responsibility.  Id. at 87.  Plaintiff performed these functions for the 26 countries to which she was still assigned.  Id. at 86-87; Exh. 12, ROI #2 at 141.

30.  Of the 26 countries for which plaintiff still retained responsibility, several had a high volume of actions, were complex and/or were high visibility countries.  Plaintiff's "major" countries, with the most work, were Spain, New Zealand, Malaysia, Greece, and Bahrain.  Exh. 1, Lee Dep. at 91.  Bahrain was a high visibility country and was moderate in terms of complexity.  Exh. 8, Seibel Dep. at 128-129.  Spain had a moderate to large number of actions associated with it and was moderate in terms of complexity.  Id. at 116, 128.  Plaintiff also had responsibility for pre-case development for the Philippines, which was a high visibility country due to the war on terror and which also was a complex country to process.  Id.

at 116, 127-128.  The workload associated with any country,
however, ebbed and flowed.  Exh. 1, Lee Dep. at 100.

31.  This was not the first time that Seibel redistributed
work among the analysts.  In December 2004 Seibel redistributed
responsibility for pre-case development for 17 countries from
Renee Dutton to Regina Graeve, another analyst in the office.
Exh. 11, Bussink Dep. at 29; Exh. 1, Lee Dep. at 93; Exh. 12, ROI
#2 at 96.

32.  Seibel redistributed responsibility for Egypt back to
plaintiff in December 2005.  Exh. 1, Lee Dep. at 84.  He later
redistributed responsibility for Australia back to plaintiff in
August 2006.  Id.

<u>Hostile Work Environment Claim</u>

33.  When Seibel decided to temporarily redistribute some of
plaintiff's responsibilities, he called a meeting of the analysts
on April 14, 2005, and announced that he had decided to
redistribute plaintiff's responsibility for Australia, Korea and
Egypt to other analysts.  Exh. 8, Seibel Dep. at 125-126; Exh. 1,
Lee Dep. at 68-69.  Plaintiff asked him in the meeting about the
reasons for this decision.  Exh. 8, Seibel Dep. at 126; Exh. 1,
Lee Dep. at 68-69.  In response, Seibel told plaintiff that he
had made the decision to redistribute these three countries in
order to give plaintiff the opportunity to "bring up the quality

9

of [her] work." Exh. 1, Lee Dep. at 68-69. Seibel did not say anything else about plaintiff's performance at the meeting. Id. at 70-73.

<u>Plaintiff's EEO Activity</u>

34. In December 2002, plaintiff testified at the administrative EEO hearing of a co-worker, Carolyn Bolling, who alleged sexual harassment by a female co-worker. Amended Complaint, ¶ 17. Randolph was unaware of plaintiff's participation in the <u>Bolling</u> matter until approximately June 2005. Exh. 3, Randolph Dep. at 47.

35. Plaintiff contacted an EEO counselor on August 3, 2004, claiming race and age discrimination, as well as reprisal, when she was denied an opportunity to apply for a GS-343-13 Program Analyst position in SEA 63IC1, and when she was not compensated at the GS-13 level although she alleged that she was performing GS-13 level duties. Amended Complaint, ¶ 7; Exh. 5 ROI #1 at 13, 24-30.

36. On May 24, 2005, plaintiff again contacted the EEO office alleging race and age discrimination, as well as reprisal when: (1) Seibel reduced her workload by reassigning her duties and responsibilities for three "major countries" to co-workers; (2) Seibel made a comment indicating that her work performance

10

needed improvement; and (3) when she was not selected for a GS-13

Program Analyst position.  Exh. 12, ROI #2 at 10-11.

                    Respectfully submitted,


                    _____/s/_____
                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                    United States Attorney


                    _____/s/_____
                    RUDOLPH CONTRERAS, D.C. BAR # 434122
                    Assistant United States Attorney


                    _____/s/_____
                    MARINA UTGOFF BRASWELL, D.C. BAR #416587
                    Assistant United States Attorney
                    U.S. Attorney's Office
                    555 4th Street, N.W. - Civil Division
                    Washington, D.C. 20530
                    (202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDA J. LEE,                          )
                                        )
        Plaintiff,                      )
                                        )
        5.                              ) Civil No. 05-1335 RWR
                                        )
DONALD WINTER, Secretary,               )
United States Navy,                     )
                                        )
        Defendant.                      )
_____)

PRELIMINARY STATEMENT

Plaintiff, an employee of the Naval Sea Systems Command

("NAVSEA") of the United States Department of the Navy, brought

this action under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e-16 ("Title VII"), and the Age

Discrimination in Employment Act of 1967, as amended, 29 U.S.C.

§ 633a ("ADEA"), alleging discrimination based on race, age and

retaliation.  In particular, plaintiff, an African American

female, alleges that she was discriminated and retaliated against

when she was denied an "accretion of duties" promotion.

Plaintiff also alleges discrimination and retaliation in

connection with her claims that she was denied the opportunity to

apply for a promotion to a GS-13 Program Analyst, and when three

of her "major countries" which were among her work

responsibilities were reassigned to co-workers.  Finally,

plaintiff alleges that she was subjected to a hostile work

environment based on race, age and retaliation when her three "major countries" were reassigned to co-workers and her supervisor stated, during a meeting with her co-workers, that the reassignment was based on plaintiff's need to improve her performance.

Certain of plaintiff's claims should be dismissed and summary judgment on the remaining claims should be granted to defendant. With respect to the "accretion of duties" promotion claim, plaintiff failed to timely exhaust her administrative remedies after being told that her request for such a promotion was denied. Nonetheless, even if plaintiff had timely exhausted this claim, NAVSEA had a policy of prohibiting such promotions during the relevant time period. Additionally, plaintiff was not eligible for such a promotion because she never requested a desk audit to support an upgrade of her position, which would have been required for any "accretion of duties" promotion.

As to the opportunity to compete for a promotion, plaintiff has only herself to blame, as she failed to place her resume in NAVSEA's RESUMIX system which would have entitled her to be considered for the promotion at issue. Moreover, under certain circumstances NAVSEA was entitled to use selection certificates generated for one GS-13 vacancy to fill a second GS-13 vacancy. Plaintiff's name was not on the certificate in question because

she had not placed her resume into RESUMIX at the relevant time, despite her knowledge of the need to do so.

Finally, as to the reassignment of certain of plaintiff's work responsibilities and the comment about her performance at an office meeting, neither rises to the level of a hostile work environment nor do they establish any inference of discrimination or retaliation.  The decision to reassign duties was comfortably within NAVSEA's prerogative to manage its employment affairs, and plaintiff cannot show any evidence of pretext.  The lone public comment about plaintiff's performance, while regrettable, simply does not establish the existence of any hostile work environment.

Accordingly, for the reasons set forth in this memorandum and accompanying exhibits, defendant respectfully submits that he is entitled to dismissal and summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Brenda J. Lee, an African American born in 1948, was a GS-343-12 Program Analyst at the Naval Sea Systems Command (NAVSEA), located at the Washington Navy Yard, Washington D.C., during the time period at issue in this case.  Amended Complaint, ¶ 2.  Plaintiff worked in the case development branch (SEA 63IC3) of the Office of International Programs (SEA 63).  Deposition of Brenda Lee (Lee Dep.), attached as Exh. 1, at 22; Administrative Report of Investigation (ROI) Transcript #1 (ROI Tr. #1),

attached as Exh. 2, at 5, 131, 134.  Plaintiff was responsible
for the pre-case development of foreign military sales (FMS)
cases in the Defense Security Assistance Management System
(DSAMS), which included Letters of Offer and Acceptance (LOA),
requests for Price and Availability (P&A) data, case amendments
and modifications.  Amended Complaint, ¶ 11; Exh. 1, Lee Dep. at
22-23.

GS-12 was the "full performance level" for plaintiff's
position.  Exh. 1, Lee Dep at 22.  Plaintiff could not be
promoted to the GS-13 level without either obtaining an
"accretion of duties" promotion or competing for selection for a
position at a higher grade level.  Id. at 21-22.

<u>Accretion of Duties Promotion Claim</u>

On April 30, 2004, plaintiff asked her third level
supervisor, Hercules Randolph, Deputy Program Manager of the
Office of International Programs during the relevant time period,
for an "accretion of duties" promotion to the GS-13 level.
Deposition of Hercules Randolph (Randolph Dep.), attached as Exh.
3, at 4-5; Exh. 1, Lee Dep. at 29; Amended Complaint, ¶ 18; Exh.
2, ROI Tr. #1, at 33-34.  Randolph told plaintiff that he could
not grant her request.  Amended Complaint, ¶ 18.  He told her
that there was a "freeze" on accretion of duties promotions.
Exh. 1, Lee Dep. at 38; Exh. 3, Randolph Dep. at 51.

4

Randolph advised plaintiff that she could request a desk
audit to see if her position could be reclassified at a higher
level.  Exh. 2, ROI Tr. #1 at 34; Exh. 3, Randolph Dep. at 68.
Randolph later told plaintiff that even if the desk audit showed
that the position could be classified at the GS-13 level, he
still could not grant her an accretion of duties promotion
because there was a freeze on such promotions; rather, he would
advertise the position and she could compete for it.  Amended
Complaint, ¶ 20; Exh. 1, Lee Dep. at 39; Exh. 2, ROI Tr. # 1 at
36.

Plaintiff claims that she did not believe Randolph when he
told her that he could not grant her an accretion of duties
promotion without competing the position, but she did not consult
with anyone in the personnel office about the rules regarding
accretion of duties promotions.  Exh. 2, ROI Tr. #1 at 34-35;
Exh. 1, Lee Dep. at 40.  Plaintiff believed that she should not
have to compete for the position, and she did not want to risk
not being selected.  Exh. 2, ROI Tr. #1 at 34-38.  Plaintiff
decided not to seek a desk audit.  Exh. 1, Lee Dep. at 37, 40-41.

<u>Non-promotion to the GS-13 Claim</u>

During the relevant time period Navy employees could express
an interest in a particular type of job, publicized by an "open
continuous vacancy announcement," such that if there were an

opening in the future, they would have already expressed an interest.  Exh. 1, Lee Dep. at 26-28.  Plaintiff was familiar with "open continuous vacancy announcements."  Id. at 26. In order to be considered for selection for promotion under the open continuous vacancy announcement system, Navy employees had to place a current resume into the Navy's "resume builder," or "RESUMIX" system, a requirement with which plaintiff was familiar.  Exh. 1, Lee Dep. at 27-28, 41.  Indeed, in January 2004 plaintiff was advised that there would be promotional opportunities in SEA 63 and that her resume should be up-to-date in RESUMIX if she had, or might have, an interest in a higher graded job.  Exh. 4, attached.

In April 2004 NAVSEA announced a vacancy for a GS-343-13 Program Analyst to perform case management duties in SEA 63IC2. Exh. 5, ROI #1 at 28, 104.  On or about May 19, 2004, the Human Resources Service Center Northwest (HRSC NW) generated selection certificates of qualified candidates for the GS-343-13 vacancy in SEA 63IC2.  One certificate listed those individuals qualified for a competitive promotion to the position.  Exh. 6, attached. The other certificate listed qualified individuals already at the GS-13 level.  Exh. 7, attached.  Plaintiff's name did not appear on either certificate.  Exhs. 6-7; Exh. 1, Lee Dep. at 44.

Raymond Ashenfelder served as the Assistant Program Manager for International Programs Management.  Exh. 5, ROI #1 at 96, 229-230.  Mr. Ashenfelder was the chair of the panel that reviewed the applications of candidates for the GS-343-13 position in SEA 63IC1 that was filled in July 2004.  Deposition of Donald Seibel (Seibel Dep.), copy attached as Exh. 8, at 31; Exh. 5, ROI #1 at 230; Exh. 3, Randolph Dep. at 85.

After consulting with Randolph and Ashenfelder, Captain Theodore Firebrick, the Program Manager for SEA 63, decided to laterally reassign Kathy Ton, a GS-13, to the GS-343-13 Program Analyst vacancy in SEA 63IC2.  Exh. 3, Randolph Dep. at 76, 82-84; Exh. 1, Lee Dep. at 44.  That left a vacancy in Ton's position, and Randolph wanted to promptly fill that vacancy as the countries assigned to that position were very important because of international problems associated with them.  Exh. 3, Randolph Dep. at 82-84.

Randolph asked one of his subordinates, Carolyn Lightfoot, to inquire about how the position could be filled quickly and was advised by Ms Lightfoot that it was permissible to use the May 19, 2004 selection certificates to fill the GS-343-13 vacancy in SEA 63IC1.  Id. at 82.  This was because during the relevant time period, NAVSEA HQ followed the Navy's OCPM Instruction on merit promotions, the CPI 335, and the Human Resources Service Center

7

(HRSC), Capital Region Instruction as a standard operating procedure.  Exh. 13, Deposition of William McCafferty (McCafferty Dep.), copy attached, at 48; Exh. 14, Declaration of William D. McCafferty (McCafferty Dec.), copy attached, ¶ 2.  Under the standard operating procedure of the HRSC Capital Region Instruction, NAVSEA HQ uses merit promotion certificates for multiple selections under certain circumstances.  McCafferty Dec., ¶ 3.  In particular, after a merit promotion (i.e., selection) certificate is generated listing qualified candidates for one vacancy, that same certificate can be used for subsequent selections when the occupational series and grade level, the area of consideration, and the knowledge, skills and abilities for the positions are the same, when the subsequent selection is made within 90 days of the issuance of the certificate, and when qualified candidates are still available for consideration.  Id.

A panel comprised of three members -- Ashenfelder, Donald Seibel (plaintiff's first level supervisor) and Fred Kraus -- evaluated the applications of qualified applicants for the SEA 63IC1 position and interviewed them.  Exh. 3, Randolph Dep. at 85; Exh. 5, ROI #1 at 189.  Thereafter, Ashenfelder advised Randolph that the panel recommended Marivic Britton, a younger Caucasian employee, as the best qualified candidate for the

8

position in SEA 63IC1.  Exh. 5, ROI #1, at 108, 189; Exh. 3,

Randolph Dep. at 85; Amended Complaint, ¶ 19.

Ashenfelder briefed Randolph on the panel's findings and

forwarded to him the selection package, including the selection

certificates.  Exh. 3, Randolph Dep. at 85; Exh. 5, ROI #1 at

189.  Randolph selected Ms. Britton for the vacancy in SEA 63IC1

on July 13, 2004.  Exh. 3, Randolph Dep. at 85; Exh. 9.

Plaintiff did not submit her resume to the Navy's resume builder

(i.e., RESUMIX) until on or about September 23, 2004.

Declaration of Catherine Sergeson, attached as Exh. 10.

<u>Assignment of Duties Claim</u>

Plaintiff, believing that she had the heaviest workload,

asked that some of her work be redistributed to the other

analysts.  Exh. 1, Lee Dep. at 64-65.  On or about March 24,

2005, Robert Bussink, Assistant Program Manager for International

Policy and Financial Management during the relevant time period

and plaintiff's second-level supervisor, met with Seibel and the

four analysts, including plaintiff, and asked for input on how to

best redistribute the work.  Deposition of Robert Bussink

(Bussink Dep.), attached as Exh. 11, at 5, 9, 29; Exh. 1, Lee

Dep. at 65; Exh. 12, ROI #2 at 135.  Bussink told them that a

workload analysis showed that plaintiff had the heaviest

workload.  Exh. 1, Lee Dep. at 65.

9

Plaintiff volunteered to relinquish responsibility for a number of "small" countries that "did not have much work associated with them."  Exh. 1, Lee. Dep. at 65.  The 12 countries initially proposed by plaintiff included Korea.  Id. at 66-67; Exh. 12, ROI #2 at 133-134.  Plaintiff's recommendation was subject to Seibel's approval.  Exh. 1, Lee Dep. at 67-68.

Subsequently, however, plaintiff advised Seibel that she wanted to continue to handle Korea.  Exh. 1, Lee. Dep. at 67.  Nonetheless, Seibel ultimately decided that, in addition to the 11 countries proposed by plaintiff, he would redistribute Korea, Australia and Egypt from plaintiff to other analysts.  Exh. 8, Seibel Dep. at 112-114.  Seibel believed that merely redistributing the countries proposed by plaintiff would not sufficiently lighten her workload and give her the opportunity to better manage her cases.  Id. at 126-127.  Seibel decided to redistribute responsibility for Australia, Korea and Egypt, because these countries in general had either a high volume of work associated with them, were more complex to process, or were high visibility countries.  Id. at 106-107, 126-127.

After the redistribution of countries took effect, plaintiff continued to perform all of the same functions of her position as she had performed previously.  Exh. 1, Lee Dep. at 86-87.  She continued to process LOAs, requests for P&A data, modifications

and amendments for the countries to which she was assigned responsibility.  Id. at 87.  Plaintiff performed these functions for the 26 countries to which she was still assigned.  Id. at 86-87; Exh. 12, ROI #2 at 141.

Of the 26 countries for which plaintiff still retained responsibility, several had a high volume of actions, were complex and/or were high visibility countries.  Plaintiff's "major" countries, with the most work, were Spain, New Zealand, Malaysia, Greece, and Bahrain.  Exh. 1, Lee Dep. at 91.  Bahrain was a high visibility country and was moderate in terms of complexity.  Exh. 8, Seibel Dep. at 128-129.  Spain had a moderate to large number of actions associated with it and was moderate in terms of complexity.  Id. at 116, 128.  Plaintiff also had responsibility for pre-case development for the Philippines, which was a high visibility country due to the war on terror and which also was a complex country to process.  Id. at 116, 127-128.  The workload associated with any country, however, ebbed and flowed.  Exh. 1, Lee Dep. at 100.

This was not the first time that Seibel redistributed work among the analysts.  In December 2004, Seibel redistributed responsibility for pre-case development for 17 countries from Renee Dutton to Regina Graeve, another analyst in the office.

Exh. 11, Bussink Dep. at 29; Exh. 1, Lee Dep. at 93; Exh. 12, ROI #2 at 96.

Seibel redistributed responsibility for Egypt back to plaintiff in December 2005. Exh. 1, Lee Dep. at 84. He later redistributed responsibility for Australia back to plaintiff in August 2006. Id.

### Hostile Work Environment Claim

When Seibel decided to temporarily redistribute some of plaintiff's responsibilities, he called a meeting of the analysts on April 14, 2005, and announced that he had decided to redistribute plaintiff's responsibility for Australia, Korea and Egypt to other analysts. Exh. 8, Seibel Dep. at 125-126; Exh. 1, Lee Dep. at 68-69. Plaintiff pressed him in the meeting about the reasons for this decision. Exh. 8, Seibel Dep. at 126; Exh. 1, Lee Dep. at 68-69. In response, Seibel told plaintiff that he had made the decision to redistribute these three countries in order to give plaintiff the opportunity to "bring up the quality of [her] work." Exh. 1, Lee Dep. at 68-69. Seibel did not say anything else about plaintiff's performance at the meeting. Id. at 70-73.

### Plaintiff's EEO Activity

In December 2002, plaintiff testified at the administrative EEO hearing of a co-worker, Carolyn Bolling, who alleged sexual

12

harassment by a female co-worker.  Amended Complaint, ¶ 17.

Randolph was unaware of plaintiff's participation in the <u>Bolling</u>

matter until approximately June 2005.  Exh. 3, Randolph Dep. at

47.  In February 2003, plaintiff filed a formal complaint

alleging that agency attorneys had reprised against her by

requesting copies of her performance evaluations for use during

the <u>Bolling</u> EEO hearing.  Exh. 5, ROI #1 at 118; Exh. 1, Lee Dep.

at 10.  The EEOC affirmed the agency's dismissal of this

complaint.  Exh. 5, ROI #1 at 118.

In May 2003, plaintiff contacted an EEO counselor alleging

that her supervisor, Bridget Shepherd, discriminated against her

based on her religion (Christianity) and in retaliation for prior

EEO activity when she did not give plaintiff an achievement

award.  <u>Id</u>.  Plaintiff did not file a formal complaint regarding

this allegation.  <u>Id</u>.

In March 2004, plaintiff contacted an EEO counselor claiming

age and race discrimination when she was excluded from a meeting

and when her supervisors, Seibel and Bussink, subjected her to

stress, impacting her work performance.  Exh. 12, ROI #2 at 93.

Plaintiff did not file a formal EEO complaint regarding these

allegations. <u>Id</u>.

Plaintiff contacted an EEO counselor on August 3, 2004,

claiming race and age discrimination, as well as reprisal, when

she was denied an opportunity to apply for a GS-343-13 Program
Analyst position in SEA 63IC1, and when she was not compensated
at the GS-13 level although she alleged that she was performing
GS-13 level duties.  Amended Complaint, ¶ 7; Exh. 5, ROI #1 at
13, 24-30.  Plaintiff filed a formal administrative complaint on
September 13, 2004.  Id. at 2-9.  The agency accepted plaintiff's
claim that she was discriminated against based on her race and
age when she was denied the opportunity to apply for the Program
Analyst position in SEA 63IC1, and when she requested and was
denied a desk audit.  Id. at 45.  The agency dismissed
plaintiff's claim that the agency had failed to promote her since
July 1998.  Id. at 46.

     After completion of an investigation, plaintiff requested a
hearing before the Equal Employment Opportunity Commission
("EEOC") on March 22, 2005.  Prior to a hearing, plaintiff
withdrew from the administrative process and filed her initial
Complaint in district court on July 1, 2005.  In her original
complaint, plaintiff alleged for the first time that she was
denied these promotional opportunities based on reprisal.
Amended Complaint, Count I.

     On May 24, 2005, plaintiff again contacted the EEO office
alleging race and age discrimination, as well as reprisal when:
(1) Seibel reduced her workload by reassigning her duties and

responsibilities for three "major countries" to co-workers; (2)
Seibel made false accusations that her work performance needed
improvement; and (3) when she was not selected for a GS-13
Program Analyst position.  Exh. 12, ROI #2 at 10-11.  On August
1, 2005, plaintiff filed a formal administrative complaint.  Id.
at 2-7.  The agency accepted the allegation regarding the
reassignment of duties but dismissed the other two allegations.
Id. at 51-53.  Following an investigation, plaintiff filed her
Amended Complaint in this Court August 1, 2005.

**ARGUMENT**

I.   **Plaintiff Failed to Exhaust Her Administrative
     Remedies with Respect to Her "Accretion of Duties'
     Promotion Claim.**

The exclusive remedy for a federal employee who claims race
discrimination is Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e *et seq.*, and the plaintiff must comply
with its administrative exhaustion requirements as a precondition
to her suit.  See, e.g., Brown v. General Services
Administration, 425 U.S. 820 (1976); Bayer v. Department of
Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992).  Similarly, if a
federal employee seeks resolution of her age claims in the EEO
administrative process, she is also subject to the exhaustion
requirement.  Chennareddy v. Bowsher, 935 F.2d 315, 317 (D.C. Cir
1991).  Only upon exhaustion of administrative proceedings is a

15

complainant entitled to a trial *de novo*.  Chandler v. Roudebush, 425 U.S. 840 (1976); Saksenasingh v. Department of Education, 126 F.3d 347, 350 (D.C. Cir. 1997).  Claims that a party failed to exhaust her administrative remedies may be subject to dismissal. Smith-Haynie v. District of Columbia, 155 F.3d 575 (D.C. Cir. 1998).

In the context of federal discrimination claims, administrative "exhaustion" requires the plaintiff to file a timely administrative charge.  Kizas v. Webster, 707 F.2d 524, 543 (D.C. Cir. 1983) (Title VII); Tyler v. United States Postal Service, 2001 U.S. Dist. LEXIS 2110, at *8 (D.D.C. Feb. 22, 2001) (ADEA).  Pursuant to authority delegated in these laws, the Equal Employment Opportunity Commission (EEOC) has promulgated regulations governing the applicable administrative remedies. See 29 C.F.R. §§ 1614 et seq.  EEOC regulations require that an employee who believes that she has been discriminated against by a federal agency must contact an EEO counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of a personnel action, within 45 days of the effective date of the action.  29 C.F.R. § 1614.105(a)(1).

In determining the timeliness of an EEO complaint under Title VII, it is essential to identify precisely the unlawful employment practice about which the plaintiff has complained.

16

<u>Delaware State College v. Ricks</u>, 449 U.S. 250, 257 (1980);

<u>Currier v. Radio Free Europe</u>, 159 F.3d 1363, 1366 (D.C. Cir.

1999).  Further, the Supreme Court has repeatedly held that the

limitations period in Title VII runs from the date of the

discrete allegedly discriminatory act, not from the date the last

effect of that act is felt.  <u>See, e.g.</u>, <u>Ledbetter v. Goodyear Tire

& Rubber Co.</u>, 127 S. Ct. 2162, 2168-69 (2007), <u>citing</u> <u>Nat'l R. R.

Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).  The Supreme Court has

held that "each incident of discrimination and each retaliatory

adverse employment decision constitutes a separate actionable

'unlawful employment practice'" that may start a new limitations

period for filing a charge.  <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S.

at 114.  Separate (<u>i.e.</u>, "discrete") incidents of discrimination

actions include terminations, failures to promote, denials of

transfer and refusal to hire.  <u>Id</u>.

Plaintiff has failed to exhaust her administrative remedies

with respect to her claim that she was unlawfully denied an

"accretion of duties" promotion.  Although plaintiff has pled

timely exhaustion of her administrative remedies, citing

Randolph's communication to her on or about July 21, 2004, <u>see</u>

Amended Complaint, ¶ 7, the triggering event for purposes of the

45-day time limit is not July 21, 2004, but rather April 30,

2004.  In particular, plaintiff alleges that she asked Randolph

for an accretion of duties promotion and that he denied that request on April 30, 2004.  Id. at ¶ 18.  This denial was unequivocal and plaintiff does not claim otherwise.  As such, she was required to contact an EEO counselor regarding the denial of her request for a promotion within 45 days of April 30, 2004 -- i.e., by June 14, 2004.  Plaintiff did not contact a counselor until August 3, 2004.  Exh. 5, ROI #1 at 13, 24-30.  Even if plaintiff's July 2004 communication with Randolph could be characterized as a second request for an accretion of duties promotion, plaintiff's request for an accretion promotion was unequivocally denied on April 30, 2004, and she cannot restart the statute of limitations simply by making a second, identical request.  See, e.g., Morgenstein v. Morgan Stanley, 2007 WL 315090 ** 3-4 (D.D.C. Jan. 31, 2007); Stewart v. D.C., 2006 WL 626921 ** 3-6 (D.D.C. Mar. 12, 2006).

Accordingly, since plaintiff's request for an "accretion of duties" promotion was unequivocally denied on April 30, 2004, plaintiff has failed to timely exhaust her administrative remedies and her accretion of duties claim must be dismissed.

18

II.  Defendant is Entitled to Summary Judgment
     On Plaintiff's Claims.

     A.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment "shall be granted if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the movant is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986);
Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Summary
judgment is not a disfavored procedural shortcut, but rather is
an integral part of the overall design of the rules of civil
procedure, which is to secure the just, speedy, and inexpensive
determination of every action.  Celotex Corp., 477 U.S. at 327.

Where no genuine dispute exists as to any material fact,
summary judgment is required.  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986).  A genuine issue of material fact is one
that could change the outcome of the litigation.   Id. at 247.
The party moving for summary judgment need not prove the absence
of an essential element of the nonmoving party's case.  Celotex,
477 U.S. at 325.  "The burden on the moving party may be
discharged by 'showing' -- that is, pointing out to the (Court) -

19

that there is an absence of evidence to support the non-moving party's case." Id.  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial.  Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Fed. R. Civ. P. 56 requires the party opposing summary judgment go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

Thus to avoid summary judgment, the plaintiff must present some objective evidence that would enable the court to find an entitlement to relief.  "(T)he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252. Unsupported speculation is not enough to defeat a summary judgment motion; the existence of specific material evidentiary facts must be shown.  Fed. R. Civ. P. 56(e); Hayes v. Shalala, 902 F. Supp. 259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere unsupported allegations or denials); Johnson v. Digital Equip. Corp., 836 F. Supp. 14, 18

20

(D.D.C. 1993) (merely colorable evidence not sufficiently probative to defeat summary judgment).

> B.    Deference Due to Agency Decisions

Before turning to the merits, a brief word is in order concerning the scope of review in employment discrimination cases.  Though plaintiff might wish it otherwise, the employment discrimination statutes did not transform federal courts into review boards for local employment decisions.  The Court of Appeals for this Circuit has made clear that "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'"  Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)).  To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

> C. Allocation of Burdens of Production and Persuasion

In the absence of direct evidence, disparate treatment claims brought under Title VII and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 633a(a), are analyzed under the burden-shifting framework established by the Supreme Court in

McDonnell Douglas v. Green, 411 U.S. 792 (1973). Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2005) (citing Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)). Claims of retaliation are also governed by the McDonnell Douglas burden-shifting paradigm. Broderick v. Donaldson, 437 F.3d 1226, 1231 (D.C. Cir. 2006).

Once plaintiff has established a prima facie case, the burden shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse action. Czekalski v. Peters, 475 F.3d 360, 363-364 (D. C. Cir. 2007), citing McDonnell Douglas, 411 U.S. at 802; see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000). If the defendant satisfies that burden, "the McDonnell Douglas framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination vel non." Czekalski, 475 F.3d at 363-364, citing Reeves, 530 U.S. at 142-143 (citations and internal quotation marks omitted). Thereafter, to "survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Id. at 363, quoting Latham v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

22

A plaintiff makes out a prima facie case of race or age discrimination by establishing that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. Czekalski, 475 F.3d at 364; Barnette, 453 F.3d at 515. To state a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected EEO activity; (2) a reasonable employee would have found the challenged action so materially adverse that she would have been dissuaded from engaging in the protected EEO activity, and (3) there was a causal connection between the protected activity and the challenged retaliatory act. See Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2412-2415 (2006); Rochon v. Gonzalez, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).

"The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm." Id. at 2415. The plaintiff must show that "a reasonable employee would have found the challenged action materially adverse." Id. Adverse actions can include actions that do not adversely affect promotion opportunities or that do not create tangible, economic loss. Gardner v. District of Columbia, 448 F. Supp.2d 70, 75-76 (D.D.C. 2006). However, "[a]n employee's decision to report discriminatory behavior cannot

23

immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington Northern and Santa Fe Ry. Co., 126 S. Ct. at 2415. This Circuit has held that, despite the absence of an explicit anti-retaliation provision in the section of the ADEA waiving federal sovereign immunity, 29 U.S.C. § 633a, the ADEA prohibits the federal government from retaliating against an employee who participates in protected EEO activity. Forman v. Small, 271 F.3d 285, 296 (D.C. Cir. 2001).

A different standard applies to plaintiff's claim that she was subjected to a hostile work environment. To establish a prima facie hostile work environment claim of race discrimination, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her protected status; (4) the harassment affected a term, condition or privilege of her employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it. Nurriddin v. Goldin, 382 F. Supp.2d 79, 107 (D.D.C. 2005), citing Jones v. Billington, 12 F. Supp.2d 1, 11 (D.D.C. 1997), aff'd 1998 WL 389101 (D.C. Cir. June 30, 1998). A workplace is "hostile" only when the offensive conduct permeates the workplace with discriminatory intimidation, ridicule, and

24

insult, and is sufficiently severe or pervasive such that it alters the conditions of the plaintiff's employment and creates an abusive working environment. <u>George v. Leavitt</u>, 407 F.3d 405, 416 (D.C. Cir. 2005) (<u>quoting Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)); <u>Runkle v. Gonzales</u>, 391 F. Supp.2d 210, 227-228 (D.D.C. 2005). Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. <u>Nurriddin</u>, 382 F. Supp.2d at 107-108; <u>Runkle</u>, 391 F. Supp.2d at 228.

A court will look at the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating and whether it unreasonably interfered with the plaintiff's work performance. <u>George</u>, 407 F.3d at 416; <u>Stewart v. Evans</u>, 275 F.3d 1126, 1133 (D.C. Cir. 2002). The Court of Appeals for this Circuit has held that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action under Title VII." <u>Bundy v. Jackson</u>, 641 F.2d 934, 943 (D.C. Cir. 1981). General harassment, if not based on an individual's membership in a protected class, is not actionable. <u>See Bolden v. PRC, Inc</u>., 43 F.3d 545, 550 (10th Cir. 1994). "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is

25

therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).

This Circuit has also held that a hostile work environment can amount to retaliation under Title VII.  Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006).  And, although this Circuit has yet to recognize that the ADEA provides a cause of action for claims of a hostile work environment, Easton v. Snow, 2006 WL1774552 *5 (D.D.C. 2006), it has noted that other courts of appeals have required a plaintiff raising an ADEA hostile work environment claim to show that (1) she is 40 years old or older; (2) the employee was subjected to harassment, either through words or actions, based on age or because she participated in activities protected by the ADEA; (3) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.  Id. at *26-27.

26

   D. Defendant is Entitled to Summary Judgment
     On Plaintiff's Claims

    1. <u>"Accretion of Duties" Promotion Claim</u>

Even if this Court finds that plaintiff has properly exhausted her "accretion of duties" promotion claim, plaintiff cannot demonstrate a <u>prima facie</u> case of discrimination and, even if she could, defendant has a legitimate, non-discriminatory basis for the action taken.

To establish a <u>prima facie</u> case where a plaintiff alleges denial of an "accretion of duties" promotion, the plaintiff must demonstrate that (1) she is a member of a protected class; (2) she sought a promotion for which she was qualified; (3) she was denied that promotion; and (4) other employees of similar qualifications were promoted at the time plaintiff's request was denied. <u>Nurriddin</u>, 382 F. Supp.2d at 95; <u>Marshall v. Shalala</u>, 16 F. Supp.2d 16, 19 (D.D.C. 1998). Although plaintiff is a member of a protected class, and she requested an accretion of duties promotion, she cannot demonstrate that she was qualified for and *applied for* a promotion to the GS-13 level. In particular, plaintiff never took the steps necessary to "apply for" an "accretion of duties" grade increase, including seeking a desk

audit.  Marshall, 16 F. Supp.2d at 19-20.  See Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999).

In addition, having failed to obtain a desk audit, plaintiff can point to no evidence that she was *qualified for* the promotion.  The only "evidence" plaintiff provides is her own assessment of her qualifications, duties and responsibilities. Plaintiff's personal subjective assessment of her own qualifications does not carry much weight.  Nurridin, 382 F. Supp.2d at 96.  Finally, plaintiff cannot meet the prima facie test because she cannot demonstrate that similarly-situated employees received accretion of duties promotions when she was denied the same or presented any other evidence from which a discriminatory motive may be inferred.  Therefore, plaintiff's prima facie case fails.

Nonetheless, defendant has articulated a legitimate, non-discriminatory reason for denying plaintiff an accretion of duties promotion – i.e., NAVSEA HQ had a policy prohibiting such promotions during the relevant time period.  Exh. 13, McCafferty Dep. at 20.  This policy was in existence before plaintiff made her request, see id., and she can point to no evidence that anyone else was treated differently than her with respect to the application of this policy.

28

Finally, with respect to her retaliation claim, plaintiff has not demonstrated a causal connection between Randolph's "denial" of an accretion promotion on April 30, 2004, and her participation in the Bolling EEO hearing in December 2002, which is the event she alleges triggered retaliation.  Causation may be established by showing that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985).  See also, Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000). "Temporal proximity is often found sufficient to establish the requisite causal connection" for retaliation claims.  Gleklen v. Democratic Congressional Campaign Committee, Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000).

While courts have not definitely "established the maximum time lapse between protected Title VII activity and alleged retaliatory actions," Brodetski v. Duffey, 141 F. Supp.2d 35, 43 (D.D.C. 2001), it is well established that the temporal proximity between the two must be "very close" to show a causal connection. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval cases finding temporal proximity of four and three months insufficient to demonstrate a causal connection).  This Court has often followed a three-month rule to

29

establish causation on the basis of temporal proximity alone.
See Willingham v. Gonzales, 391 F. Supp.2d 52, 61-62 (D.D.C.
2005); see also Buggs v. Powell, 293 F. Supp.2d 135, 148 (D.D.C.
2003); Gustave-Schmidt v. Chao, 360 F. Supp.2d 105, 118-19
(D.D.C. 2004) (referring to end of three-month window as "outer
limit" of "temporal requirement in a retaliation case"), aff'd,
No. 04-5181, 2004 WL 2348142, (D.C. Cir. Oct. 19, 2004), reh'g
denied, No. 04-5181 (D.C. Cir. Feb. 11, 2005).

     In the instant case, Randolph advised plaintiff that he
could not give her an accretion promotion on April 30, 2004, *16
months* after she testified at the Bolling EEO hearing in December
2002.  Although the Bolling matter was pending over several
years, plaintiff's participation in the case matter was limited
to this one-time testimony.  As such, the time lapse between
plaintiff's testimony and Randolph's promotion denial does not
establish causation, and, in fact, negates any inference of
causation.  Mayers v. Laborers' Health & Safety Fund, No. 05-7137
(D.C. Cir. Mar. 2, 2007) (finding 8 or 9 months too long).

     Since there is no temporal proximity between the two events
plaintiff must present some other evidence that would suggest to
a reasonable fact-finder that there was a connection between her
testimony in the Bolling case and Randolph's later action in
"denying" her request for an accretion promotion.  However,

30

plaintiff can point to no evidence that would suggest that
Randolph retaliated against her because of her testimony in the
Bolling case.  Randolph was not named as an alleged
discriminating official in the Bolling case and there is no
evidence that Randolph knew that plaintiff had participated in
the Bolling case at the time he denied her request for an
accretion promotion.  To the contrary, Randolph clearly testified
that he was not aware of her participation in the Bolling case at
the time he denied her request in April 2004.  Exh. 3, Randolph
Dep. at 47.

Additionally, the undisputed evidence shows that Randolph
approved awards for plaintiff in September 2003 and September
2004, during the same time period plaintiff alleges that Randolph
harbored discriminatory animus against her for testifying on
behalf of Bolling.  Exh. 1, Lee Dep. at 79-81; Exh. 15, attached.

Accordingly, there is no evidence that the denial of
plaintiff's request for an "accretion of duties" promotion
constitutes discrimination or retaliation.

2.   "Nonselection" For GS-13 Position

Plaintiff alleges that the defendant discriminated and
retaliated against her when Randolph denied her a promotion to
the position of GS-13 Program Analyst in July 2004.  Amended
Complaint, ¶ 19 & Counts 1-III.  In particular, she claims that

31

Randolph discriminated and retaliated against her when he
selected a younger, white employee with no prior EEO activity --
Marivic Britton -- from among the applicants for another vacant
position, knowing plaintiff had not applied for this other
position.  Plaintiff claims that this action unlawfully denied
her a chance to compete for the GS-13 position.  Id. at ¶ 19.

　　　To begin with, plaintiff's prima facie case is weak.  To
make a prima facie case for discriminatory non-selection, the
plaintiff must demonstrate that (1) she is a member of a
protected class; (2) she applied for and was qualified for an
available position; (3) she was rejected despite her
qualifications; and (4) the position was either filled or the
employer continued to seek applicants to fill its vacancy.
Lathram, 336 F.3d at 1088.  While failure to apply for a position
is not a per se bar to a non-selection claim, the plaintiff must
have made every reasonable attempt to convey her interest in the
job to the employer.  See Cones, 199 F.3d at 512, 518.

　　　Here, plaintiff can point to no evidence that she alerted
NAVSEA to her desire for advancement into any GS-13 job *via
competitive procedures* prior to the selection of Britton for the
SEA 63IC1 position.  Plaintiff was well aware of promotional
opportunities during the relevant time period.  In January 2004
plaintiff received an email telling her that there would be

promotional opportunities in SEA 63 and that her resume should be up-to-date in RESUMIX if she had, or might have, an interest in a higher graded job.  Exh. 4.  Even after she saw a recruitment flyer for a GS-343-13 Program Analyst position in April 2004, she still did not submit her resume to RESUMIX.  Indeed, plaintiff never submitted her resume for consideration for any competitive promotions via RESUMIX/RESUME BUILDER until September 23, 2004. Exh. 10.

Plaintiff's prima facie case of retaliation is similarly weak.  Even if she could establish that the she was subjected to tangible harm when Randolph decided to use the May 19, 2004 selection certificate, she cannot meet the third prong of the prima facie test for retaliation claims because she cannot establish a causal connection between Randolph's decision to select Britton in July 2004 and plaintiff's testimony in December 2002 on behalf of a co-worker's EEO claim.

Defendant has articulated a legitimate, non-discriminatory reason for Randolph's decision to select Britton – i.e., it was permissible under personnel policies to use the May 19, 2004 selection certificate, initially generated to fill the GS-343-13 position in SEA 63IC2, to fill the GS-343-13 vacancy in SEA 63IC1.  Exh. 14, McCafferty Dec., ¶ 3.  Plaintiff's name was not on that certificate.  Exhs. 6-7.  Given this fact, plaintiff was

33

not considered for selection. Plaintiff cannot show that this
reason was a pretext for discrimination.

Accordingly, based on all of the above, no reasonable jury
could conclude that Randolph's decision to use the May 19, 2004
selection certificates was motivated by discrimination or
retaliation.

### 3.  Redistribution of Job Duties

In her Amended Complaint, plaintiff alleges that her
supervisor, Donald Seibel, "stripped" her of her job
responsibilities for countries with the "greatest workload" --
i.e., Australia, Egypt and Korea -- and assigned those duties to
co-workers outside of her protected class.  Amended Complaint,
¶ 21.  The "practical effect," according to plaintiff, was that
she was left with "virtually no work to do."  Id.

First, plaintiff cannot establish a prima facie case of
discrimination or retaliation because there is absolutely no
evidence that she was aggrieved as a result of the
redistribution.  Unlike the plaintiff in Forkkio v. Powell, 306
F.3d 1127 (D. C. Cir. 2002), plaintiff here does not claim that
she was assigned significantly different responsibilities after
May 2, 2005.  In fact, she concedes that she performed the very
same types of job functions after the redistribution as she
performed prior to the redistribution.  Exh. 1, Lee Dep. at 86-

87.  In particular, plaintiff's job, both before and after May 2, 2005, consisted of processing LOAs, requests for P&A information, modifications and amendments for FMS cases.  Id.  Plaintiff continued to perform these same functions with respect to 26 countries still assigned to her after this date.  Id.

Nor can plaintiff point to any evidence that after May 2, 2005, she was required to use a lesser degree of skill in executing her pre-case development job functions.  Although plaintiff states that Egypt, Australia, and Korea were her "major" countries (thus suggesting that the countries she continued to process were other than "major"), she cannot produce any evidence that she was required to use a greater degree of skill in processing actions associated with these three countries.

Further, although plaintiff claims that she was left with "virtually no work to do" as a result of the redistribution of Egypt, Australia and Korea, the undisputed evidence shows that plaintiff retained responsibility for 26 countries, some of which had a fair amount of work associated with them, were complex to process, or were high visibility because of the war on terror. Exh. 8, Seibel Dep. at 116, 127-129.  Plaintiff even characterized some of these countries as "major."  Exh. 1, Lee Dep. at 91.  Plaintiff also conceded that the amount of work

35

ebbed and flowed for any country. Exh. 1, Lee Dep. at 100.
Clearly, the undisputed evidence does not support plaintiff's
claim that she was left with virtually no work.

Nor is there any other evidence that plaintiff was otherwise
harmed by the decision to redistribute her responsibility for
Egypt, Australia and Korea. Plaintiff continued to receive cash
awards for her performance -- in particular, she received two
cash awards, one in June 2005 and a second in September 2005.
Exh. 1, Lee Dep. At 79-81. One of those awards was for her work
on cases for the Philippines. Id. Nor is there any evidence
that plaintiff was denied any promotional opportunities because
she no longer had responsibility for these three countries.
Finally, although plaintiff pled that her performance rating
would no doubt be negatively impacted by this reassignment, there
is no evidence that this in fact occurred or of any tangible harm
in this regard. See Nurridin, 382 F. Supp.2d at 94.

Consequently, it is clear that plaintiff was not subjected
to any tangible harm when Egypt, Australia, and Korea were
temporarily reassigned to other employees. As such, she was not
subjected to any adverse action and cannot establish a prima
facie case of discrimination or retaliation.

Moreover, defendant has articulated a legitimate,
nondiscriminatory reason for redistributing plaintiff's

36

responsibility for Egypt, Australia and Korea to co-workers
–i.e., management redistributed responsibility for these three
countries to lighten plaintiff's workload and to more evenly
distribute work among the analysts.  Exh. 8, Seibel Dep. at 112-
114; 127-127.  This reassignment was done for a temporary period.
Exh. 1, Lee Dep. at 84.  There is simply no evidence that
Seibel's decision to temporarily reassign responsibility for the
three countries was tainted with discriminatory or retaliatory
animus.

     In fact, the overwhelming evidence is otherwise.  The
undisputed facts show that plaintiff actively sought a reduction
in her workload because she believed she had the heaviest
workload among the analysts.  Exh. 1, Lee Dep. at 65.  At a
meeting in March 2005, the purpose of which was to reassign her
work, plaintiff only proposed reassignment of a number of
countries that had "little work associated with them."  Id.
Although Seibel initially concurred with plaintiff's
recommendation to redistribute the countries proposed by
plaintiff, he later reconsidered and decided to redistribute
three additional countries -- Egypt, Australia and Korea -- since
there was more work associated with these countries, and he
believed that their redistribution would lighten plaintiff's
workload and give her the opportunity to "wrap her arms around

her caseload." Exh. 8, Seibel Dep. at 126-127. Seibel had the authority to make these types of decisions. Exh. 1, Lee Dep. at 67-68.

Based on all of the above, Seibel's actions cannot reasonably be viewed as discriminatory or retaliatory.

### 4. Hostile Work Environment Claim

Finally, plaintiff alleges that she was subjected to a hostile work environment based on her race, age, and in retaliation for prior EEO activity. Amended Complaint, ¶ 26, Count IV. In addition to citing Seibel's redistribution decision discussed above, plaintiff alleges that the statement made by Seibel, when he announced the decision to redistribute some of her work, mentioning the need for plaintiff to improve her performance, constituted a hostile work environment.

Reviewing the totality of the circumstances, including the frequency, nature, severity and offensiveness of the alleged incident, plaintiff's claim does not meet the threshold of severe or pervasive and abusive discriminatory conduct. First and foremost, there is no evidence that any offensive or abusive language was directed at plaintiff. The only comment attributed to Seibel was that he was redistributing these three countries to "bring up the quality of [plaintiff's] work." Exh. 1, Lee Dep. at 68-69. This statement was entirely neutral and made no

38

reference, direct or indirect, to plaintiff's race, age or participation in EEO activity.  See <u>Nurriddin</u>, 382 F. Supp.2d at 108-109.

Further, the two acts that plaintiff alleges in support of her hostile work environment claim occurred on <u>one</u> day -- <u>i.e</u>., April 14, 2005 -- when Seibel announced his decision to redistribute the three countries and mentioned her performance. As such, plaintiff cannot establish that she was subjected to a *pervasive pattern* of harassment.  See <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 787-88 (1998) (factor in assessing hostility of work environment is whether plaintiff was physically threatened).

Finally, apart from the one alleged comment by Seibel, the only other "hostile" event on which plaintiff relies is the very employment action she contends was discriminatory and retaliatory – <u>i.e</u>., Seibel's decision to redistribute Egypt, Australia and Korea.  Plaintiff cannot bootstrap her claims of discrimination and retaliation regarding the redistribution decision in order to allege a hostile work environment.  <u>Nurriddin</u>, 382 F. Supp.2d at 108-109.  See <u>Edwards v. EPA</u>, 456 F. Supp.2d 72, 95 (D.D.C. 2006) (<u>citing</u> <u>Lester v. Natsios</u>, 290 F. Supp.2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims. . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory

39

intimidation or insult.")); see also Keeley v. Small, 391 F.
Supp.2d 30, 50-51 (D.D.C. 2005).

Accordingly, based on all of the above, plaintiff cannot
establish the existence of a hostile work environment.

CONCLUSION

Accordingly, for the reasons set forth above, dismissal and
summary judgment should be granted to defendant.

Respectfully submitted,


                    /s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


                    /s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


                    /s/
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDA J. LEE,                        )
                                     )
          Plaintiff,                 )
                                     )
          v.                         )  Civil No. 05-1335 RWR
                                     )
DONALD WINTER, Secretary,            )
United States Navy,                  )
                                     )
          Defendant.                 )
_____     )

ORDER

          Upon consideration of defendant's motion to dismiss and for

summary judgment, plaintiff's responding opposition, and the

entire record in this case, and it appearing to the Court that

the grant of defendant's motion would be just and proper, it is

hereby

          ORDERED that defendant's motion to dismiss and for summary

judgment is granted; and it is further

          ORDERED that this case is dismissed with prejudice.


                              _____
                              UNITED STATES DISTRICT JUDGE

Marina Utgoff Braswell
Assistant U.S. Attorney
U.S. Attorney's Office
555 4th St., N.W.
Washington, D.C. 20530

Charles W. Day, Jr.
Gebhardt & Associates, LLP
1101 17th Street, NW
Suite 807
Washington, D.C. 20036-4716