IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

BRENDA J. LEE,

    Plaintiff,

  -vs-                                    :  Civil Action No.:
                                             05-1335 (RWR)
DONALD C. WINTER,
SECRETARY OF THE NAVY,

    Defendant.

- - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, June 14, 2006

The deposition of HERCULES RANDOLPH, III, called for examination by counsel for Plaintiff, pursuant to notice, in the offices of Gebhardt & Associates, LLP, 1101 17th Street, NW., Suite 807, Washington, D.C., convened at 9:40 a.m., before Emma N. Lynn, a Notary Public in and for the District of Columbia, when were present on behalf of the parties:

EXH. 3

Civil No. 05-1335 RWR

JARDIM REPORTING ASSOCIATES
(703)867-0396

```
1                P R O C E E D I N G S
2    Whereupon,
3            HERCULES RANDOLPH, III
4    was called for examination by counsel for the
5    Plaintiff and, having been first duly sworn by the
6    notary public, was examined and testified as
7    follows:
8    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9            BY MR. DAY:
10       Q.   Good morning, Mr. Randolph. My name is
11   Charles Day. I am an attorney for the plaintiff in
12   this case, Brenda J. Lee.
13            Could you state your full legal name for
14   the record, please.
15       A.   Hercules Randolph, III.
16       Q.   Mr. Randolph, what is your position?
17       A.   I'm the deputy program manager in the
18   Office of International Affairs. I forgot the title
19   of my office.
20       Q.   It is a long title.
21       A.   It is a long title.
22       Q.   And this is with what command?
```

5

1  A.  The Naval Sea Systems Command.
2  Q.  And in a nutshell, what does the Naval Sea
3  Systems Command do?
4  A.  Overall we provide systems, subsystems,
5  ships and munitions for the Navy. I specifically
6  work in foreign military sales doing something
7  similar for its foreign allies.
8  Q.  Mr. Randolph, are you taking any
9  medications today that would prevent you from
10 telling the truth at your deposition?
11 A.  No, I'm not.
12 Q.  Could you state your race, please.
13 A.  African American.
14 Q.  And what is your date of birth?
15 A.  2-16-1953.
16 Q.  And that makes you how old?
17 A.  That makes me 53.
18     (The following testimony has been placed
19 in a separate transcript under seal.)
20
21
22

1  failing a little bit right now.

2  But it wasn't anything organizationally
3  that I had a need to know, and I am trying to figure
4  out the conditions in which I gained knowledge of it
5  right now. But it wasn't -- I haven't had it long,
6  I can say that for a fact.

7  Q. Do you know if you were aware of it, became
8  aware of it before or after Ms. Lee filed her current
9  EEO complaint?

10  A. It would have been after that.

11  Q. Before Ms. Lee filed her current EEO
12  complaint, were you aware that she had filed a
13  previous EEO complaint?

14  A. No. No. I knew that she had -- I knew she
15  had -- once again, I am not making a clear division
16  between the two. I knew there was some activity
17  associated with the EEO organization that involved
18  her current first and second level supervisor that
19  she was engaged in. How far that went, I'm not
20  sure. But I do recall that. I do recall that there
21  was some activity and whether she continued on it
22  with, I'm not sure. But I do recall that. I do

1  Q.  What was the substance of that discussion?
2  A.  The discussion had to do with the accretion
3  of duties.
4  Q.  What did she say? What did you say?
5  A.  She wondered whether we would consider
6  accretion of duties for her current position. She
7  felt that she was warranted being paid, I guess, at
8  a higher level.
9       At the time I told her that we were not
10 as a command giving accretion of duties. It wasn't
11 what we were doing.
12      Then there was a subsequent conversation
13 within a few months following that. Yes, a few
14 months following that when we find ourselves in the
15 same conversation or similar conversation. I
16 invited Ms. Lightfoot, who is my program operations
17 manager, and she tends to have a fairly decent
18 knowledge of personnel matters and she helps me with
19 them basically. So I brought her in, and I asked
20 her about the current policy, because basically what
21 I was trying to do was validate other than Randolph
22 saying it.

1   At that time she was able to say to Ms.
2   Lee that is, indeed, the current policy. The
3   command is not allowing accretion of duties.
4   Basically what would have to happen is that we would
5   have to do a desk audit, and Ms. Lightfoot validated
6   that by the fact that she had just checked into the
7   matter for another one of my leaders because the
8   question came up from someone else. And she had
9   just been over to personnel to discuss it. So
10  basically she had fairly recent and fresh knowledge
11  of what the policy was.
12      Q.  Did she cite any particular written policy
13  to that effect?
14      A.  No. She referred to the individual who at
15  that time or as of today was knowledgeable in that
16  area. I don't recall his name right now. But I
17  know it is a gentleman. Once again, I will probably
18  think of it in a minute. But she referred, gave Ms.
19  Lee his name. She cited who it was. And if memory
20  serves me right, I think there was an offer to even
21  go over there if you want, that sort of thing.
22  Whether they did that, I don't recall.

1    A.   It depends, because it varies. We have GS-12s in SEA 10, which is the corporate office. They have the authority to send things out once it has been blessed maybe by their leadership. Because there is such a volume of information, it doesn't necessarily have to be driven by grade level.

7    Q.   Mr. Randolph, when Ms. Lee first approached you about an accretion of duties promotion, did you give her any advice on how she might obtain a promotion?

11   A.   I don't know if it was advice. But I told her the mechanics, as I understood them to be, that we would do a desk audit. If she desired, we could do a desk audit. If they found the position to be at the GS-13 level equivalent, that we would have to do one or two things. We would have to advertise the position, which of course she could compete for, or we had the option of pulling some duties to bring the grade level down.

20   Q.   Suppose you had advertised the position and Ms. Lee had not been selected.

22   A.   Okay.

82

1  Not until later on when there a discussion with Mr.
2  Ashenfelder about the selection of Ms. Vickie
3  Britton did I realize, whoa, that was the first time
4  I encountered that.
5    Q.   Whose decision was it not to advertise the
6  position in 63 IC 1?
7    A.   Not to advertise it? What we did, I told
8  Ms. Lightfoot. I said, okay, now we got to fill
9  this. Because of the countries and what was going
10 on with them that I indicated earlier, I said we got
11 to fill this because we not only solve an internal
12 problem, but we got an international problem. What
13 do we do? What is the quickest way to get this
14 done?
15      She went to our AO, Wayne Richardson, who
16 said, hey, you already got a cert. Of qualified
17 applicants, okay. Use that existing cert.
18   Q.   That was Mr. Richardson's advice?
19   A.   Yes.
20   Q.   And you followed his advice?
21   A.   Yes.
22   Q.   How often in your experience have you used

1  an existing cert. For another job?
2      A.   I personally don't recall doing -- if you
3  are asking have I done anything like this particular
4  situation, no, I don't recall doing this, no.
5      Q.   Did it occur to you at the time that this
6  was a little bit unusual?
7      A.   No. The purpose of even putting out the
8  flyer is to get a list of qualified applicants.
9  That's the purpose of even putting it out. Okay. So
10 we were looking -- were not looking -- I will make
11 this very clear. We are not looking for a person to
12 work country A or country B. We are looking for a
13 person that is able, willing and will work country
14 A, B, C, D, E and whatever country comes up. So
15 what we were looking for is the list of qualified
16 applicants, the people who would best satisfy the
17 requirements from the cert, and we had that.
18     Q.   Are you trying to achieve fairness in the
19 promotion process?
20     A.   Always.
21     Q.   In that case, why not just send out another
22 flyer?

84

1    A.    Time.

2    Q.    And why was time more of a factor in this
3    case than in any other case?

4    A.    The countries that I listed earlier and the
5    requirements associated with them that I knew we were
6    working on, I needed somebody in that job fast. And
7    Mr. Ashenfelder -- Mr. Watson, I knew wasn't a
8    hands-on kind of guy. He really didn't travel
9    anymore and I needed someone in that job. And the
10   captain agreed. Mr. Ashenfelder agreed that we got
11   to fill the position.

12        You see, the countries associated with
13   that, there was a need, okay. That need spilled
14   over to support the United States Government. That's
15   what drove it. That's what drove the priority.

16   Q.    Who has that job today?

17   A.    Wow. It has gone through so many
18   iterations. Ms. Britton left. It is going to have
19   to come to me. This is not something that I --
20   right now I don't recall.

21        MR. DAY:    Let's take a short break, if we
22   may.

1         (Recess.)
2         MR. DAY:  Back on the record.
3         BY MR. DAY:
4    Q.   Mr. Randolph, who was the selectee for the position in 63 IC 1?
6    A.   IC 1?  Ms. Vickie Britton.
7    Q.   And who was the selecting official?
8    A.   The selecting official was myself.
9    Q.   And what were your reasons for selecting Ms. Britton?
11   A.   It was a recommendation from my panel, my rating and evaluating panel.
13   Q.   Who was on that panel?
14   A.   Mr. Ashenfelder was the lead person for that panel.  I believe Mr. Seibel was on that panel.  And there was one other.  I don't recall who that was.
18   Q.   Mr. Kraus sound right?
19   A.   Yes, thank you.  That is who it was.  Fred.
20   Q.   And how did the panel convey its recommendation to you?
22   A.   Initially via an e-mail.  Mr. Ashenfelder