## COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

BRENDA J. LEE,

     Plaintiff,

  -vs-

DONALD C. WINTER,
SECRETARY OF THE NAVY,

    Defendant.

- - - - - - - - - - - - - - - x

:
:
:
:
:
:  Civil Action No.:
:  05-1335 (RWR)
:
:
:
:
:

Washington, D.C.

Wednesday, June 14, 2006

    The deposition of HERCULES RANDOLPH, III, called for examination by counsel for Plaintiff, pursuant to notice, in the offices of Gebhardt & Associates, LLP, 1101 17th Street, NW., Suite 807, Washington, D.C., convened at 9:40 a.m., before Emma N. Lynn, a Notary Public in and for the District of Columbia, when were present on behalf of the parties:

EXH. 3

Civil No. 05-1335 RWR

JARDIM REPORTING ASSOCIATES
(703)867-0396

4

```
1                    P R O C E E D I N G S

2          Whereupon,

3                    HERCULES RANDOLPH, III

4    was called for examination by counsel for the

5    Plaintiff and, having been first duly sworn by the

6    notary public, was examined and testified as

7    follows:

8      EXAMINATION BY COUNSEL FOR THE PLAINTIFF

9          BY MR. DAY:

10     Q.    Good morning, Mr. Randolph.  My name is

11   Charles Day.  I am an attorney for the plaintiff in

12   this case, Brenda J. Lee.

13          Could you state your full legal name for

14   the record, please.

15     A.    Hercules Randolph, III.

16     Q.    Mr. Randolph, what is your position?

17     A.    I'm the deputy program manager in the

18   Office of International Affairs.  I forgot the title

19   of my office.

20     Q.    It is a long title.

21     A.    It is a long title.

22     Q.    And this is with what command?
```

5

1       A.     The Naval Sea Systems Command.

2       Q.     And in a nutshell, what does the Naval  Sea

3    Systems Command do?

4       A.     Overall we provide systems, subsystems,

5    ships and munitions for the Navy.  I specifically

6    work in foreign military sales doing something

7    similar for its foreign allies.

8       Q.     Mr. Randolph, are you taking any

9    medications today that would prevent you from

10   telling the truth at your deposition?

11      A.     No, I'm not.

12      Q.     Could you state your race, please.

13      A.     African American.

14      Q.     And what is your date of birth?

15      A.     2-16-1953.

16      Q.     And that makes you how old?

17      A.     That makes me 53.

18             (The following testimony has been placed

19   in a separate transcript under seal.)

20

21

22

47

1  failing a little bit right now.

2        But it wasn't anything organizationally

3  that I had a need to know, and I am trying to figure

4  out the conditions in which I gained knowledge of it

5  right now.  But it wasn't -- I haven't had it long,

6  I can say that for a fact.

7      Q.    Do you know if you were aware of it,  became

8  aware of it before or after Ms. Lee filed her current

9  EEO complaint?

10     A.    It would have been after that.

11     Q.    Before Ms. Lee filed her current EEO

12  complaint, were you aware that she had filed a

13  previous EEO complaint?

14     A.    No.  No.  I knew that she had -- I knew  she

15  had -- once again, I am not making a clear  division

16  between the two.  I knew there was some  activity

17  associated with the EEO organization that  involved

18  her current first and second level  supervisor that

19  she was engaged in.  How far that  went, I'm not

20  sure.  But I do recall that.  I do  recall that there

21  was some activity and whether she  continued on it

22  with, I'm not sure.  But I do recall that.  I do

51

1    Q.    What was the substance of that  discussion?

2    A.    The discussion had to do with the  accretion

3    of duties.

4    Q.    What did she say?  What did you say?

5    A.    She wondered whether we would consider

6    accretion of duties for her current position.  She

7    felt that she was warranted being paid, I guess, at

8    a higher level.

9         At the time I told her that we were not

10   as a command giving accretion of duties.  It wasn't

11   what we were doing.

12        Then there was a subsequent conversation

13   within a few months following that.  Yes, a few

14   months following that when we find ourselves in the

15   same conversation or similar conversation.  I

16   invited Ms. Lightfoot, who is my program operations

17   manager, and she tends to have a fairly decent

18   knowledge of personnel matters and she helps me with

19   them basically.  So I brought her in, and I asked

20   her about the current policy, because basically what

21   I was trying to do was validate other than Randolph

22   saying it.

52

1        At that time she was able to say to Ms.

2   Lee that is, indeed, the current policy.  The

3   command is not allowing accretion of duties.

4   Basically what would have to happen is that we would

5   have to do a desk audit, and Ms. Lightfoot validated

6   that by the fact that she had just checked into the

7   matter for another one of my leaders because the

8   question came up from someone else.  And she had

9   just been over to personnel to discuss it.  So

10  basically she had fairly recent and fresh knowledge

11  of what the policy was.

12      Q.   Did she cite any particular written  policy

13  to that effect?

14      A.   No.  She referred to the individual who  at

15  that time or as of today was knowledgeable in  that

16  area.  I don't recall his name right now.  But  I

17  know it is a gentleman.  Once again, I will  probably

18  think of it in a minute.  But she referred, gave Ms.

19  Lee his name.  She cited who it was.  And  if memory

20  serves me right, I think there was an  offer to even

21  go over there if you want, that sort  of thing.

22  Whether they did that, I don't recall.

68

1    A.    It depends, because it varies. We have

2    GS-12s in SEA 10, which is the corporate office.

3    They have the authority to send things out once it

4    has been blessed maybe by their leadership. Because

5    there is such a volume of information, it doesn't

6    necessarily have to be driven by grade level.

7    Q.    Mr. Randolph, when Ms. Lee first approached

8    you about an accretion of duties promotion, did you

9    give her any advice on how she might obtain a

10   promotion?

11   A.    I don't know if it was advice. But I told

12   her the mechanics, as I understood them to be, that

13   we would do a desk audit. If she desired, we could

14   do a desk audit. If they found the position to be

15   at the GS-13 level equivalent, that we would have to

16   do one or two things. We would have to advertise

17   the position, which of course she could compete for,

18   or we had the option of pulling some duties to bring

19   the grade level down.

20   Q.    Suppose you had advertised the position and

21   Ms. Lee had not been selected.

22   A.    Okay.

1  within her authority put them on hold.  Basically

2  stop, you are going to follow the

3  procedures, because NAVSEA dictates the guidelines

4  we set and they have been very successful for us,

5  and there had been some irregularities along the

6  way.  She froze that.  Stopped that.  Let's get

7  things in order here.

8         Meanwhile we had a personnel issue that

9  involved myself, the captain, involved Mr.

10  Ashenfelder, and one of his senior leaders, Mr.

11  George Watson, and Ms. Kathy Ton.  Ms. Ton was

12  emotionally in a very bad way.  So we decided, we

13  said, okay, what do we do about this.  We had to do

14  something because we could not leave her in the

15  environment she was in.

16         So the next best thing was, hey, we have

17  the other position over there.  It is a program

18  analyst position.  We are going to management direct

19  reassignment, approved by Captain Frederick.  We

20  moved her.

21     Q.    What kind of environment was she in?

22         MS. BRASWELL:  Objection to the extent  this

82

1  Not until later on when there a  discussion with Mr.

2  Ashenfelder about the selection  of Ms. Vickie

3  Britton did I realize, whoa, that was  the first time

4  I encountered that.

5     Q.    Whose decision was it not to advertise  the

6  position in 63 IC 1?

7     A.    Not to advertise it?  What we did, I told

8  Ms. Lightfoot.  I said, okay, now we got to fill

9  this.  Because of the countries and what was going

10  on with them that I indicated earlier, I said we got

11  to fill this because we not only solve an internal

12  problem, but we got an international problem.  What

13  do we do?  What is the quickest way to get this

14  done?

15        She went to our AO, Wayne Richardson, who

16  said, hey, you already got a cert. Of qualified

17  applicants, okay.  Use that existing cert.

18     Q.    That was Mr. Richardson's advice?

19     A.    Yes.

20     Q.    And you followed his advice?

21     A.    Yes.

22     Q.    How often in your experience have you  used

83

1  an existing cert. For another job?

2      A.    I personally don't recall doing -- if you

3  are asking have I done anything like this particular

4  situation, no, I don't recall doing this, no.

5      Q.    Did it occur to you at the time that this

6  was a little bit unusual?

7      A.    No.  The purpose of even putting out the

8  flyer is to get a list of qualified applicants.

9  That's the purpose of even putting it out.  Okay.  So

10  we were looking -- were not looking -- I will  make

11  this very clear.  We are not looking for a  person to

12  work country A or country B.  We are  looking for a

13  person that is able, willing and will  work country

14  A, B, C, D, E and whatever country  comes up.  So

15  what we were looking for is the list  of qualified

16  applicants, the people who would best  satisfy the

17  requirements from the cert, and we had  that.

18      Q.    Are you trying to achieve fairness in the

19  promotion process?

20      A.    Always.

21      Q.    In that case, why not just send out  another

22  flyer?

84

1      A.   Time.

2      Q.   And why was time more of a factor in this

3  case than in any other case?

4      A.   The countries that I listed earlier and  the

5  requirements associated with them that I knew we were

6  working on, I needed somebody in that job  fast.  And

7  Mr. Ashenfelder -- Mr. Watson, I knew  wasn't a

8  hands-on kind of guy.  He really didn't  travel

9  anymore and I needed someone in that job.  And the

10  captain agreed.  Mr. Ashenfelder agreed that we got

11  to fill the position.

12          You see, the countries associated with

13  that, there was a need, okay.  That need spilled

14  over to support the United States Government.  That's

15  what drove it.  That's what drove the  priority.

16      Q.   Who has that job today?

17      A.   Wow.  It has gone through so many

18  iterations.  Ms. Britton left.  It is going to have

19  to come to me.  This is not something that I --

20  right now I don't recall.

21          MR. DAY:  Let's take a short break, if we

22  may.

1          (Recess.)

2          MR. DAY:  Back on the record.

3          BY MR. DAY:

4      Q.   Mr. Randolph, who was the selectee for  the

5  position in 63 IC 1?

6      A.   IC 1?  Ms. Vickie Britton.

7      Q.   And who was the selecting official?

8      A.   The selecting official was myself.

9      Q.   And what were your reasons for selecting

10  Ms. Britton?

11     A.   It was a recommendation from my panel, my

12  rating and evaluating panel.

13     Q.   Who was on that panel?

14     A.   Mr. Ashenfelder was the lead person for

15  that panel.  I believe Mr. Seibel was on that  panel.

16  And there was one other.  I don't recall who that

17  was.

18     Q.   Mr. Kraus sound right?

19     A.   Yes, thank you.  That is who it was.  Fred.

20     Q.   And how did the panel convey its

21  recommendation to you?

22     A.   Initially via an e-mail.  Mr. Ashenfelder