# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

```
BRENDA J. LEE,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )  Civil Action No. 05-1335 (RWR)
                                  )
DONALD C. WINTER,                 )
SECRETARY OF THE NAVY             )
                                  )
          Defendant.              )
_____ )
```

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

Plaintiff Brenda J. Lee, by and through undersigned counsel, hereby opposes Defendant's Motion to Dismiss and Motion for Summary Judgment and in support of her Opposition states as follows:

Like the Roman Catholic Church and the United States Congress, the United States Navy has neither been prepared to acknowledge nor countenance the existence of gay sex in its ranks. See, e.g., Randal Archibald, San Diego Diocese Settles for $200 Million, NY Times Sept. 8, 2007; William Yardley, Craig Defends Decision to Stay in Senate and Attacks Romney, NY Times Oct. 16, 2007. Indeed, the Navy, trying to live down its centuries old reputation for "rum, sodomy, and the lash," is perhaps the most sensitive of the three on this score, and is

the only one with an official "Don't ask, Don't Tell" policy with respect to homosexuals. <u>See</u> Sir Winston S. Churchill, <u>Columbia World of Quotations</u>, Columbia University Press (1996) (last visited November 17, 2007) <<u>http://www.bartleby.com/66/85/12385.html></u>; 10 U.S.C. § 654(b).

Carolyn Bolling's allegation in 1997 of gay sexual misconduct (unwanted open-mouth kissing and fondling by a female supervisor) within the civilian supervisory ranks of the Naval Sea Systems Command (NAVSEA) was therefore explosive, and resulted in nine years of litigation that finally settled "on the courthouse steps" in 2006. <u>See</u> <u>Bolling v. England</u>, C.A. 05-757 (E.D. Va. 2006). During the decade that Ms. Bolling pursued her lawsuit, which was well known to NAVSEA management, Plaintiff Brenda J. Lee was Ms. Bolling's key witness. <u>See</u> Ex. 1, Randolph Dep. at 32; Ex. 2, Declaration of Carolyn D. Bolling. Ms. Lee provided a shocking statement to the EEO investigator in January 1999, and equally shocking testimony at Ms. Bolling's EEOC hearing on December 3, 2002. <u>See</u> Ex. 3 and 4 (white supervisor Christine Chaikowski tongue-kissed Ms. Lee and patted her behind). Ms. Lee's last testimony took place during her deposition on May 8, 2006. <u>See</u> Ex. 5, Cover Sheet of Dep. Tr. Because she played a key role in exposing same-sex

sexual misconduct among the upper echelons of Navy civilian management, Ms. Lee has found her career stalled and her (modest) ambitions thwarted.

## **Background**

Brenda J. Lee is a 37-year employee of the federal government, most of which she has spent with NAVSEA, where she plays an important role in ensuring that the allies of the United States are properly equipped with naval hardware. Ex. 7, Lee Dep. at 22-25. As a GS-12 Logistics Management Analyst, Ms. Lee is responsible for modifications and amendments to orders for naval hardware placed by a wide range of U.S. allies. Id. Ms. Lee has held her current position without a promotion since 1991, during which time she has been performing the same work as her higher-graded GS-13 colleagues. Ex. 8, ROI at 28.

In 1999, Ms. Lee submitted a Declaration in a NAVSEA administrative investigation of same-sex sexual harassment charges filed by fellow employee Carolyn Bolling against their supervisor, Christine Chaikowski. Ex. 3, Declaration of Brenda Lee; Amend. Compl. ¶ 16. Ms. Lee stated in her Declaration that Ms. Chaikowski had tried to kiss Ms. Lee once during the 1980s and had recently patted her bottom. Id. Ms. Lee testified that she was aware that Ms. Chaikowski had engaged in similar conduct

3

toward other female employees at NAVSEA. Id. Subsequently, on December 3, 2002, Ms. Lee testified to these events at Ms. Bolling's EEOC hearing. See Ex. 4.

Ms. Lee's life changed dramatically after her testimony in Ms. Bolling's case. Ex. 7, Lee Dep. at 76. During the period from December 2002 to September 2004, Ms. Lee, who was unrepresented at the time, filed four EEO complaints to protest the treatment that she was receiving in her workplace. Ex. 7, Lee Dep. at 10-12; Ex. 8, ROI at 12-18, 118; Ex. 9, Report of Investigation DON 05-00024-01542 (ROI #2) at 93. In fact, Ms. Lee's EEO activity was so persistent that her third-line supervisor was aware of it. Ex. 1, Randolph Dep. at 47-48. "I do recall that there was some [EEO] activity . . . in fact, I do remember her going down to the [EEO] office." Id. Ultimately, Ms. Lee's complaints culminated in the complaints at issue in this case over non-promotion and retaliation in the workplace. Ex. 8, ROI at 12-18.

Following her testimony in Ms. Bolling's case, Ms. Lee, an older (DOB: Dec. 4, 1948) African American woman, has been twice denied the opportunity to compete for a promotion, whether a promotion based on her increased job responsibilities (accretion of duties) or a promotion through the Navy's normal competitive

4

process. _Id_. In addition, she has been retaliated against in the workplace by having her responsibilities for the accounts of three major countries removed from her duties at a time when the Navy was changing to a new personnel system that puts a premium on the quantity as well as the quality of work done. _See_, _e.g._ National Security Personnel System (last updated Nov. 16, 2007) <http://www.cpms.osd.mil/nsps/index.html>.

Ms. Lee's duties and responsibilities are documented in her position descriptions, of which the Navy has at different times produced different and conflicting versions. Ex. 8, ROI 51-55; Ex. 6, Slagle Dep. Ex. 2.  The duties described in the position descriptions first produced by the Navy in its own Report of Investigation show duties that are in virtually every respect (save percentages of time on each duty) identical to those of Ms. Lee's GS-13 counterparts. Ex. 8, ROI 51-55.  In contrast, the "official" position description subsequently produced by Defendant in discovery shows three undated, unsigned pen-and-ink modifications to the typewritten text of the position descrip-tion that purport to show a lower level of responsibility in Ms. Lee's position than in the GS-13 positions.  Ex. 6, Slagle Dep. Ex. 2.  Defendant has no explanation as to how these pen-and-ink modifications were made, who made them, when they were made, or

5

why a conflicting version of the position descriptions was given to the Agency's EEO investigator as part of the official investigation in this case. Ex. 6, Slagle Dep. at 25.

Assuming for the sake of argument that the Navy's latter position description is genuine, the cover sheet is dated July 11, 2002. Ex. 6, Slagle Dep. Exh. 2 at 1.  The Navy's version of the position description refers to "practical knowledge" of Ms. Lee's duties, but it gives no indication of what amount of experience is necessary to acquire "thorough knowledge" or "mastery" of these duties to the extent required for a GS-13. Id. at 2, 8.  Although it sets a lower floor than the GS-13 position description, it gives no indication of how the position should be classified when that floor is exceeded. Id.

Aware that she was performing the same work as her GS-13 colleagues without receiving the same grade or compensation, Ms. Lee gave the Navy several opportunities to promote her and correct the inequity of her misclassified position.  First, Ms. Lee engaged her third-line supervisor Hercules Randolph in an ongoing discussion about promotion through accretion of duties that culminated in an exchange of emails in late August 2004. Ex. 8, ROI at 22-23.  Mr. Randolph presented Ms. Lee with a Hobson's choice: either refrain from a desk audit and remain in

6

her current (underpaid/lower-graded) position or undergo a desk audit and have to compete to keep her position if it were upgraded to GS-13. Ex. 7, Lee Dep. at 30, 37, 39, 118; Ex. 1, Randolph Dep. at 71-72; Ex. 8, ROI at 22.   Mr. Randolph never pointed out that other possibilities existed which would allow her to keep her position after a desk audit, such as reassigning some of her duties. Id. (A desk audit simply assesses the level of work an employee is currently performing, whereas an accretion of duties promotion provides for a promotion to an employee whose work exceeds what is required at the employee's current grade level.  See Ex. 6, Slagle Dep., Ex. 3.)

By law, the Navy is required to maintain an official Merit Promotion Plan. Ex. 6, Slagle Dep. at 44-46.  The Navy's Merit Promotion plan at the time Ms. Lee requested an accretion of duties promotion provided for promotion through accretion of duties. Ex. 6, Slagle Ex. 3, 4.  However, NAVSEA appears to have decided at a managers' lunch to freeze accretion of duties promotions.  See Def. Ex. 14, Attach. 3. There does not appear to have been any formal modification of the Merit Promotion Plan to preclude promotions through accretion of duties.

The effect of Ms. Lee's ongoing conversation about accretion of duties with Mr. Randolph was two-fold.  First, it

7

discouraged Ms. Lee from seeking a position through accretion of duties for fear that it would lead to the loss of her position — and possibly her employment — with the federal government. Id.; Ex. 8, ROI at 22-23. Secondly, it put Mr. Randolph on notice that Ms. Lee was seeking a higher-graded position. Id.

Despite the fact that Mr. Randolph was on notice that Ms. Lee was seeking a higher-graded position, the Navy engaged in a bizarre series of personnel maneuvers that denied her the chance to apply. Amend. Compl. ¶¶ 17-19. The Navy tries to make much of the fact that Ms. Lee did not apply for a position that did not interest her. See Def. Mot. at 27-28. But the point of Ms. Lee's Complaint is that the Navy never gave Ms. Lee the opportunity to apply for the position that did interest her. Ex. 7, Lee Dep. at 46. Ms. Lee had years of experience with the countries in the position in 63IC1[1] for which the Navy selected Marivic Britton, a less-experienced, younger white employee who had never engaged in EEO activity (Ms. Britton had applied for the 63IC2 job), without advertising the position. Ex. 1,

_____

[1]63IC1 is a code for an office in NAVSEA; 63IC2 is a companion office that performs similar functions but for different countries.

Randolph Dep. at 76, 82.

The Navy's excuse for not advertising the 63IC1 position in which Ms. Lee was interested was they already had a Certificate of Eligibles for a similar position in 63IC2, which they had advertised.  Ms. Lee did not apply for the position in 63IC2 because it dealt with countries different from those with which she had worked for so many years. Ex. 7, Lee Dep. at 51, 56-57; Ex. 1, Randolph Dep. at 80, 82-84; Ex. 8, ROI at 104.  The Navy did not fill the position in 63IC2 — which they had advertised — from the Certificate of Eligibles. Ex. 1, Randolph Dep. 82-84. Instead, the Navy laterally transferred a white employee, Kathy Ton, from 63IC1, creating the new vacancy in 63IC1. Ex. 1, Randolph Dep. at 76; Ex. 7, Lee Dep. at 44.

The Navy thus filled non-competitively the position that it had advertised, and then used the Certificate of Eligibles to fill a different position that it had not advertised. Id.  Mr. Randolph knew that Ms. Lee was interested in a promotion.  It was common knowledge which countries Ms. Lee dealt with and which countries were dealt with in 63IC1.  To have dealt fairly with Ms. Lee, all the Navy would have had to do was advertise the position in 63IC1 through the normal competitive process. This they did not do.

Ms. Lee learned that the 63IC1 position had been filled on July 21, 2004. Ex. 8, ROI at 4-6, 29. Ms. Lee complained of her non-selection to both Don Seibel and Hercules Randolph that same day. <u>Id</u>. Shortly thereafter, on April 14, 2005, Ms. Lee suffered the reassignment to her co-workers of a significant number of the countries for which she was responsible, particularly Egypt, Australia, and Korea, which formed the greater part of her workload. Ex. 7, Lee Dep. at 58-59, 68-69. The result was that she was left with virtually nothing to do. The reassignment of the Ms. Lee's countries was accompanied by her direct supervisor's comment in an open meeting that her countries were being reassigned against her will because she needed to "improve the level of her performance." Ex. 7, Lee Dep. at 59, 68-69. Even Ms. Lee's co-workers protested this inappropriate discussion of personnel matters in an open meeting. <u>Id</u>. The involuntarily reassignment of Ms. Lee's countries came after Ms. Lee had received approval from her supervisor for a different, voluntary reassignment of countries that would have had more modest and acceptable impact on Ms. Lee's workload. Ex. 7, Lee Dep. at 67. Instead, Ms. Lee's supervisor chose to arbitrarily reassign the heart of Ms. Lee's workload on the eve of the Navy's transition to a performance

based personnel system, leaving Ms. Lee to "get off on the wrong foot" as the new system began. See Ex. 7, Lee Dep. at 59.

### Standard for Motion to Dismiss

A ruling that a plaintiff has failed to state a claim under 12(b)(6) may be granted only in extraordinary circumstances. United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). In deciding a motion to dismiss, a plaintiff's allegations must be accepted as true. See Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Scott v. England, 264 F. Supp. 2d 5, 6 (D.D.C. 2002) (Court must accept all of the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor). Additionally, Rule 8(a)(2) merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief". The party bringing a 12(b)(6) motion has the burden to show that Rule 8(a)(2) has not been met. Kehr Packages, Inc. v.

11

<u>Fidelcor, Inc.</u>, 926 F.2d 1406, 1409 (3rd Cir. 1991). The court's role at the 12(b)(6) stage is not to evaluate the strength or weakness of claims. <u>Jacobson v. Hughes Aircraft Co.</u>, 105 F.3d 1288, 1292 (9th Cir. 1997) . A plaintiff's brief may always be used "to clarify allegations in her complaint whose meaning is unclear." <u>Pegram v. Herdrich</u>, 530 U.S. 211, 230 n.10 (2000).

### **Plaintiff Has Stated a Timely Claim of Non-Promotion**

Defendant is both factually and legally incorrect in arguing that Ms. Lee's informal complaint of reprisal and discrimination with respect to denial of an accretion of duties promotion was untimely.

When Ms. Lee initially approached Mr. Randolph in April 2004 about an accretion of duties promotion, he told her that she could request a desk audit that could provide a promotion to GS-13. Ex. 7, Lee Dep. at 30, 37, 39, 118; Ex. 1, Randolph Dep. at 71-72; Ex. 8, ROI at 22, A.5. Mr. Randolph did not hold to his promises to help Ms. Lee obtain a promotion through a desk audit, a fact with which Ms. Lee later reproached him. <u>See</u> <u>id</u>. Mr. Randolph disputes Ms. Lee's version and states that he told Ms. Lee that there was a freeze on accretion of duties promotions, but she could ask for a desk audit. Ex. 1, Randolph

12

Dep. at 71-72; Ex. 8, ROI at 22.   In July 2004, Ms. Lee again
approached Mr. Randolph about the possibility of a desk audit
— which he had not previously denied.   Ex. 7, Lee Dep. at 30,
37, 39, 118; Ex. 1, Randolph Dep. at 71-72; Ex. 8, ROI at 22.
It was only then that Mr. Randolph stated to Ms. Lee that if he
gave her a desk audit and the audit showed her duties to exceed
her grade level, he would have to open her position to
competition. Ex. 7, Lee Dep. at 30, 37, 39, 118; Ex. 1, Randolph
Dep. at 71-72; Ex. 8, ROI at 22. As a result, she would have to
compete to keep her own job. Ex. 1, Randolph Dep. 68; Ex. 7, Lee
Dep. 188.   It was only at this point that Ms. Lee was
unequivocally denied a promotion through accretion of duties and
was therefore obligated to file her complaint of discrimination.
See Ex. 8, ROI at 22, 23, 29.   In fact, it was not until this
point in the conversation that Mr. Randolph believed he had
given Ms. Lee a "final determination." Ex. 1, Randolph Dep. at
73.

Defendant makes much of the fact that Mr. Randolph
supposedly "unequivocally denied" Ms. Lee's request for an
accretion of duties promotion, but in fact, as Defendant admits,
he offered her a desk audit. Def. Mot. at 2-3 ¶¶ 7-8.   This is
quite a different situation from that in the cases cited by

Defendant. <u>Morgenstein v. Morgan Stanley</u> involves the filing of a disability complaint under the D.C. Human Rights Act in which the plaintiff filed a complaint of denial of accommodation of his disability a year and a half after he had first requested the accommodation. Civil Action No. 06-127 (JDB) (D.D.C. June 6, 2006). The Court held that he could not restart the limitations period by making another request for accommodation. <u>Stewart v. D.C.</u> likewise involves a mental patient who makes an untimely request for reasonable accommodation following her mental breakdown in unsafe working conditions. C.A. No. 04-1444 (CKK) (D.D.C. March 12, 2006). In both of these cases, the accommodation was unequivocally denied at a time outside the applicable period of limitations. Ms. Lee, far from attempting to restart the statute of limitations, was simply engaged in an ongoing conversation with Mr. Randolph about whether she could — or should — have desk audit. Not until Mr. Randolph told her that he would have to open her position to competition if she accepted his offer of a desk audit was there an "unequivocal denial."

Not only is Ms. Lee's complaint timely under the facts at issue, but even if it were not, it would be subject to equitable tolling or the "lulling doctrine":

> Under this doctrine, a defendant cannot seek the
> shelter of the statute of limitations if the defendant
> has acted to lull the plaintiff into a state of
> inaction. [citation omitted]. Where equitable
> estoppel requires fraud with respect to facts which
> form the underlying basis of a claim, the lulling
> doctrine can also be applied where a defendant wrongly
> convinces a plaintiff that claims will be redressed
> without the need for a lawsuit.

Jankovic v. Int'l Crisis Group, 429 F. Supp. 2d 165, 172 (D.D.C. 2006). In this case, Mr. Randolph represented to Ms. Lee that he would help her obtain her GS-13 if she would refrain from filing an EEO complaint. Ex. 8, ROI at 5. Ms. Lee relied on Mr. Randolph's representations to her detriment and forewent filing an EEO complaint until it was apparent that Mr. Randolph was not going to keep his promises or grant her promotion. Id. Again, only at that point was it apparent that Mr. Randolph and the Navy were "conclusively denying" her request for a promotion.

Finally, the cases upon which Defendant principally relies are not on point in this case. First, they concern requests for reasonable accommodation of disabilities not promotions. See Morgenstein, C.A. 06-127 (JDB); Stewart, C.A. 04-1444 (CKK). Their rationale, which is suspect, is that a Plaintiff should not be able to restart the limitations period by asking second time for an accommodation if the underlying disability has not

15

changed. <u>Morgenstein</u>, C.A. 06-127 (JDB) at 8-10; <u>Stewart</u>, C.A. 04-1444 (CKK) at 11.    Ruling that a Plaintiff with a serious disability may seek enforceable relief one time and nevermore thereafter, despite the fact that the disability is ongoing, seems like a cruel and wrongheaded result.  To the extent that it is the law in this jurisdiction, it should be limited to its facts.  Moreover, in the case of promotions, where an employee continues to grow and develop, take on new assignments, and achieve new goals, it makes no sense to say that if the employee asks for a promotion once, no subsequent request — no matter how much the employee or the job has changed — can be considered enforceable under the discrimination laws.

### Standard for Summary Judgment

In order to obtain summary judgment, the moving party (Defendant) must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Diamond v. Atwood</u>, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine what facts are "material," the Court must look to the substantive law on which each count or claim rests.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A "genuine issue" exists if the

16

resolution of that issue "could establish an element of a claim or defense and, therefore affect the outcome of the action." Carter, 180 F. Supp. 2d at 102 (citing Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248).

This Court has stated that "[i]n ruling on a motion for summary judgment, the court must draw all inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." Carter, 180 F. Supp. 2d at 102 (quoting Anderson, 477 U.S. at 248); see also Stewart v. Ashcroft, 211 F. Supp. 166, 169 (D.C. Cir. 2003). Morever, "the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution." Carter, 180 F. Supp. 2d at 103; see also Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879-80 (D.C. Cir. 1997) (rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998)(en banc)); Johnson v. Digital Equip. Corp., 836 F. Supp. 14, 18 (D.D.C. 1993).

The Navy's repeated denial of a promotion to Ms. Lee and its subsequent mistreatment of her state a clear case of retaliation and discrimination based on race and age that should be submitted to a jury for decision.

17

## Prima Facie Case

Ms. Lee has clearly made out a <u>prima facie</u> case of retaliation for both of the positions for which she was not selected, whether by accretion of duties/misclassification or denial of an opportunity to compete for a position for which she was more qualified than the selectee.

> Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "opposed any practice" made unlawful by Title VII, or because he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). In order to make out a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) the employer took an adverse action against him; and (3) there is a causal connection between the two. <u>Taylor v. Small</u>, 350 F.3d 1286, 1292 (D.C. Cir. 2003). The plaintiff must show that a reasonable employee would have found the challenged action to be "materially adverse," meaning it "well might have `dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Burlington Northern & Santa Fe Ry.</u>, 126 S. Ct. at 2415. [citation omitted] A plaintiff can satisfy the causal connection requirement by showing that "the employer had knowledge of the employee's protected activity, and ... the adverse personnel action took place shortly after that activity.'"

<u>Ginger v. D.C.</u>, 477 F. Supp. 2d 41, 51 (D.D.C. 2005).

First, Ms. Lee clearly engaged in statutorily protected activity by testifying in Carolyn Bolling's well-known complaint before the EEOC, as well as by filing a series of subsequent EEO

complaints to protest retaliation by the Navy. See Def. Mot. at
12-15.  Secondly, Ms. Lee clearly suffered an adverse action by
being denied a promotion through accretion of duties and denied
the opportunity to compete for the promotion in 63IC1.  See
Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 1 (2002);
Velikonja v. Gonzales, No. 05-5030 (D.C. Cir. October 17, 2006).
Though Mr. Randolph improbably denies that he knew specifically
of Ms. Lee's testimony in Ms. Bolling's EEO complaint, even he
admits that he knew of prior EEO activity on Ms. Lee's part. Ex.
1, Randolph Dep. at 47-48; Ex. 2, Bolling Declaration.  Finally,
Ms. Bolling's case was ongoing even after Ms. Lee filed her
complaint in this case, and therefore continued to be an
irritant to the Navy until Ms. Bolling's court case was settled
in September 2006.   As Defendant admits, Ms. Lee's EEO
complaints continued through March 2004.  Def. Mot. at 13.

    In addition, although Defendant disputes that Ms. Lee can
show that she was qualified for the position at issue, a jury
could clearly decide that Ms. Lee met the qualifications based
on Ms. Lee's record, experience, position description, and the
GS-13 position descriptions of Ms. Lee's colleagues.  See Ex.
8, ROI 51-64; Ex. 6, Slagle Dep. Exh 2.  After all, the gravamen
of Ms. Lee's complaints is precisely that she was denied the

opportunity to demonstrate that she was the most qualified
candidate through the normal personnel process, whether because
she was discouraged from asking for a desk audit or because
management jiggered the application process so that she could
not apply.    Finally, as a result of Ms. Lee's opening
conversation with Mr. Randolph in April 2004 about a promotion
through an accretion of duties, it was plain to Mr. Randolph
that Ms. Lee was interested in a promotion.

### Accretion of Duties

Pursuant to the Navy's Merit Promotion Plan, a promotion is
not subject to competitive procedures if it is a "promotion
resulting from an employee's position being reclassified at a
higher grade because of additional duties and responsibilities."
HRSC Capital Instruction 12335 (June 8, 2000) at 3.  Accretion
of duties was previously defined in the Navy's Merit Promotion
Plan as having the following requirements: "(1) The major duties
of the employee's old position are absorbed into the new
position, and the former is cancelled; (2) The new position has
no known promotion potential; and (3) The additional duties do
not adversely affect another incumbered position."   Ex. 6,
Slagle Dep., Ex. 3.

Under either definition, Ms. Lee should have been promoted

to GS-13 in 2004.  First, the evidence of record plainly shows
that either Ms. Lee's position is misclassified or the positions
of the similarly situated GS-13 co-workers in her unit — Regina
Graeve, Renee Dutton, and Barbara Hall — are misclassified, as
testified by Plaintiff's expert, former USDA personnel director
Larry B. Slagle. Ex. 6, Slagle Dep. at 29-32, Ex. 2; see Ex. 8,
ROI 51-64. With two exceptions, the GS-12 position description
of Ms. Lee is identical to the GS-13 position description's of
her co-workers.  The first exception is the percentage of time
performed on particular duties, which varies somewhat among the
position descriptions. Ex. 6, Slagle Ex. 1.  As Ms. Slagle
testified  in  his  deposition,  these  percentages  are  not
determinative of the grade of the positions at issue. Id.  The
second exception lies at the root of genuine dispute of material
fact  in  the  evidence  underlying  this  case:  the  conflicting
versions of Ms. Lee's position description in the government's
records.

The government provided one set of position descriptions to
its  official  EEO  investigator,  which  are  incorporated  in  the
Report of Investigation. Ex. 8, ROI at 55-64.  Subsequently, in
the  course  of  discovery,  the  government  provided  another,
different position description, a fact which is suspicious on

21

its face. Ex. 6, Slagle Ex. 2.   The government's altered position description contains three pen and ink changes: "Mastery" is changed to "practical knowledge"; "thorough knowledge" is changed to "practical knowledge" and "expert advice" is changed to "advice."   Ex. 6, Slagle Dep. Ex. 2. These changes are not dated, not signed, not even initialed. It is unknown who made them or when. However, Defendant seizes on these three minor disputed pen-and-ink changes to argue that the whole meaning of the position description is changed so radically as to warrant a different classification from the otherwise virtually identical GS-13 position descriptions.  This is precisely the kind of subterfuge that a jury would see through.

In light of the fact that the position description of Ms. Lee and the position descriptions of her GS-13 colleagues are identical or virtually identical, it hardly needs an expert to determine that one group or the other is misclassified. Nevertheless, that is exactly what Plaintiff's expert, Mr. Slagle, did determine. Ex. 6, Slagle Dep. 29-32.  As the lone GS-12, Ms. Lee would seem to be the far more likely candidate for a misclassification than the three GS-13's with whom she worked.  If Ms. Lee was in fact misclassified, then her grade

should have been corrected by the Navy when she requested it. In fact, the Navy did nothing to investigate or correct the misclassification of Ms. Lee's position, but instead discouraged her from taking any action to pursue a reclassification and promotion by threatening to force her to compete for her own position. Ex. 7, Lee Dep. at 30, 37, 39, 118; Ex. 1, Randolph Dep. at 71-72; Ex. 8, ROI at 22.

The Navy seeks to justify its discouragement of Ms. Lee from pursuing reclassification or accretion of duties by citing a "policy" against accretion of duties promotions. See Def. Ex. 14 Attach 3. The documentation of this "policy," which purports to override the official Merit Promotion Plan of the Navy, consists of a typewritten notes from a luncheon meeting. See id. Such a cavalier attitude toward the provisions of the Merit Promotion plan surely raises a triable issue of fact as to whether the Merit Promotion Plan was properly modified, and consequently whether the "policy" cited by the Navy ever had any legal effect. Ex. 6, Slagle Dep. at 51.

Moreover, even if the Navy had a bona fide policy against accretion of duties promotions, which is doubtful, it still cannot skirt the consequences of a misclassification of Ms. Lee's position. Ex. 6, Slagle Dep. 29-32, Ex. 1. The Navy

23

cannot consistently argue that two different positions with essentially the same position descriptions can properly be classified a grade apart. When Ms. Lee was doing the same work as Ms. Dutton, Ms. Hall, and Ms. Graeve, she should have been classified at the same grade and receiving the same pay. To argue otherwise is to fly in the face of fundamental principles of equity. Management does not and cannot explain or justify its actions on this point.

Mr. Randolph's citation of the so-called "policy" against accretion of duties is clearly a pretext for denying Ms. Lee a fair chance to show either that she was deserving of an accretion of duties promotion or that her position had been misclassified. The pretextual nature of Mr. Randolph's statements to Ms. Lee is clear because he told her — at best — a half truth. Mr. Randolph told Ms. Lee that if a desk audit showed that her position qualified for a GS-13 grade, then her position might be opened to competition. Ex. 7, Lee Dep. 37-39; Ex. 1, Randolph Dep. 68-69. As a result, Ms. Lee would have to compete with other applicants to keep her own position. He did not tell her that even if her position were opened to competition, the likelihood that she would lose her job in the Navy after 34 years of service was very small. Ex. 1, Randolph

Dep. at 69-70.   Mr. Randolph, however, was quite content to leave Ms. Lee with the impression that if she attempted to vindicate her rights to fair pay and equal treatment, she would place her federal career in jeopardy.

### Discriminatory Non-selection

After Ms. Lee filed her EEO complaint against Mr. Randolph for denying her an accretion of duties promotion in 2004, the Navy advertised a GS-13 Program Analyst position in 63IC2.  Ms. Lee did not apply for this position because 63IC2 dealt with a different set of countries from the countries with which Ms. Lee had worked for many years.  See Ex. 1, Randolph Dep. at 80; Ex. 7, Lee Dep. at 56; Ex. 8, ROI at 104.  When management decided to laterally and noncompetitively reassign Kathy Ton from 63IC1 to 63IC2, they created a vacancy in 63IC1.   In contrast to 63IC2, which dealt with countries in which Ms. Lee had no background and no interest, 63IC1 dealt with the same set of countries with which Ms. Lee had been working for many years. See Ex. 1, Randolph Dep. at 80; Ex. 7, Lee Dep. at 56.  It was an obvious fit, and would have been seen as an obvious fit to Ms. Lee's supervisors:  Hercules Randolph, Robert Bussink, and Donald Seibel.

The normal course would have been to advertise the newly

available position in 63IC1 under competitive procedures.  In
fact, Mr. Randolph had to consult with personnel to see whether
it was even permissible to use a Certificate of Eligibles for
one position in order to fill another position. Ex. 1, Randolph
Dep. at 82.  Instead of following the normal procedure, however,
Mr. Randolph chose to fill the position in 63IC1 using the
Certificate of Eligibles for the position in 63IC2 that he had
advertised. He did this in full knowledge that Ms. Lee was
interested in a promotion and that his decision would short-
circuit the normal competitive process for that position.  Id.
The result was the selection of a younger, white employee who
had never engaged in any EEO activity. Def. Mot. at 6.

### Reassignment of Duties

Following Ms. Lee's formal EEO complaint filed on September
13, 2004 concerning Mr. Randolph's denial of an opportunity to
compete for a position in 63IC1, Ms. Lee continued to suffer
ongoing retaliation.  See Burlington-Northern v. White, No.
05-259 (June 26, 2006).  Ms. Lee is responsible for processing
orders for modifications and amendments for a number of
countries, some of which demand more time and work than others.
At the time, in March of 2005, Ms. Lee had a heavier workload
than the other Program Analysts.  Ex. 8, ROI 2 at 96, 97.  The

26

solution proposed by the analysts and approved by management was for the analysts among themselves to plan a reallocation of the workload.  The analysts did so, and Mr. Seibel duly approved their plan.  Ex. 7, Lee Dep. at 67.  Then, at a staff meeting on April 14, 2005, Mr. Seibel unilaterally altered the planned and approved schedule, reassigning Ms. Lee's major countries of Egypt, Australia, and Korea.  Ex. 7, Lee Dep. at 68-69. Defendant seeks to make hay out of the fact that Ms. Lee still had some countries left on which she apparently did some work, but this does not alter the fact that Ms. Lee's principal countries had been taken away from her.

This is precisely the kind of issue — involving credibility determinations and weight of the facts — that should be committed to the jury.  See, e.g. United States v. Scarborough, 452 F.2d 1378, 1380 n.3 (D.C. Cir. 1971).  Compounding the injury and providing additional evidence of discriminatory animus were the comments from her supervisor, Mr. Seibel, that she needed to bring up the quality of the work. Ex. 10, Seibel Dep. at 129-131.  For this comment, he was rebuked by his subordinates.  Id. These actions take place against the impending implementation of the Navy's new pay-for-performance system, the National Security Personnel System (NSPS).  See,

27

e.g. National Security Personnel System (last updated Nov. 16, 2007) <http://www.cpms.osd.mil/nsps/index.html>.    In any performance-based personnel system, employees are going to be concerned over the number and quality of their assignments. In this case, removing Ms. Lee's prime assignments just as the Navy was phasing in NSPS has a clearly adverse effect.    There is no question that under the liberal standard set by Burlington Northern, that Mr. Seibel's actions could constitute retaliation. At the same time, Mr. Seibel was well aware of Ms. Lee's prior and ongoing EEO activity, Ex. 10, Seibel Dep. at 20-22, and took action against her with impunity because of it.

In light of the repeated denial of promotions to Ms. Lee and the other retaliation she has suffered since testifying on behalf of her co-worker in a controversial same-sex harassment case, Ms. Lee should be granted a jury trial so that she has an opportunity to obtain her long-awaited GS-13 promotion, back pay, compensatory damages, and the reasonable attorney fees and expenses of bringing this case. Accordingly, summary judgment should be denied.

### Oral Argument Requested

Oral argument is respectfully requested on Defendant's Motion to Dismiss and for Summary Judgment, Plaintiff's

Opposition, and any Reply.

Respectfully submitted,


_____/s/_____

CHARLES W. DAY, JR.
    D.C. Bar No. 459820
JOSEPH D. GEBHARDT
    D.C. Bar No. 113894
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

November 19, 2007         Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

BRENDA J. LEE,                    )
                                  )
         Plaintiff,               )
                                  )
    v.                            ) Civil Action No. 05-1335 (RWR)
                                  )
DONALD C. WINTER,                 )
SECRETARY OF THE NAVY             )
                                  )
         Defendant.               )
_____    )

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

1-2.    Not disputed.

3.      Disputed.  Plaintiff could also be promoted through a reclassification of her position. Slagle Dep. Ex. 1.

4.      Disputed.  Plaintiff twice sought a desk audit, but was discouraged from following through by Hercules Randolph's threat to compete her position. Lee Dep. at 30, 37, 39, 118; Randolph Dep. at 71-72; ROI at 22.

5.      Not disputed.

6.      Disputed.  Mr. Randolph stated or implied that he could help Ms. Lee obtain a promotion through a desk audit. ROI at 22.

30

7-11.     Not disputed.

12.     Disputed. Defendant has no evidence that Ms. Lee actually received or read the cited email.

13-15.     Not disputed.

16.     Disputed to the extent that the statement implies that the position was filled in July 2004 trough the competitive process, when in fact it was filled by Kathy Ton through a lateral assignment.

17.     Not disputed.

18.     Disputed. Defendant has not shown that the positions could not have been timely filled through the competitive process, and the fact that Ms. Britton did not stay in the position undercuts Mr. Randolph's credibility. Randolph Dep. at 87.

19-26.     Not disputed.

27.     Disputed to the extent that Plaintiff's recommendation was not merely subject to Mr. Seibel's approval but received Mr. Seibel's approval. Lee Dep. at 67.

28.     Disputed. Despite Mr. Seibel's gratuitous comment about Ms. Lee's performance, Defendant

31

has made no showing that Ms. Lee needed to manage her cases better, in fact she had recently received performance awards. Lee Dep. at  Mr. Seibel pulled Ms. Lee's major countries in reprisal for her testimony in the Bolling case and subsequent EEO activity.

29.   Disputed.  Seibel had previously approved the employees' plan to lighten Ms. Lee's load. Id. The additional removal of Korea, Australia, and Egypt was gratuitous and punitive because Ms. Lee exercised her rights under the discrimination laws.

30.   Disputed.  Korea, Australia, and Egypt were the countries that constituted the majority of Plaintiff's work before they were reassigned, and after they were reassigned, Plaintiff was left with virtually nothing to do. Lee Dep. at 56.

31.   Not disputed.

32.   Disputed.  Seibel distributed responsibility for her countries back to Plaintiff only after Plaintiff had filed suit to recover them.

33.   Not disputed.

34.        Disputed.  Randolph admitted that he was aware of

Plaintiff's "EEO activity" before that date.

Randolph Dep. at 47-48.

35-36.    Not disputed.

Respectfully submitted,


                          _____/s/_____
                          CHARLES W. DAY, JR.
                               D.C. Bar No. 459820
                          JOSEPH D. GEBHARDT
                               D.C. Bar No. 113894
                          GEBHARDT & ASSOCIATES, LLP
                          1101 17th Street, N.W.
                          Suite 807
                          Washington, DC 20036-4716
                          (202) 496-0400

November 19, 2007         Attorneys for Plaintiff

33