# EXHIBIT 1



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

RECEIVED

JUN 2 6 2006

GEBHARDT

- - - - - - - - - - - - - - x
                        :
BRENDA J. LEE,         :

      Plaintiff,    :

                        :
   -vs-          :  Civil Action No.:
                        :  05-1335 (RWR)
DONALD C. WINTER,    :
SECRETARY OF THE NAVY,  :
                        :
     Defendant.    :
                        :
- - - - - - - - - - - - - - x

                Washington, D.C.

                Wednesday, June 14, 2006


        The deposition of HERCULES RANDOLPH,

III, called for examination by counsel for

Plaintiff, pursuant to notice, in the offices of

Gebhardt & Associates, LLP, 1101 17th Street, NW.,

Suite 807, Washington, D.C., convened at 9:40 a.m.,

before Emma N. Lynn, a Notary Public in and for the

District of Columbia, when were present on behalf of

the parties:

1    A.    Not on a regular basis.  She works  directly

2  with one of the individuals in my  organization, more

3  direct on a regular basis.  My  interaction with her

4  tends to be more of when there  is something high

5  level going on, when there is an  issue ongoing with

6  the particular area that she  works in.  Other than

7  that, I don't really have much to say to her.  But,

8  yes, we have had encounters.

9    Q.    Are you aware that Ms. Bolling filed a

10  sexual harassment complaint against Ms. Chaikowski?

11    A.    I became aware of that after some period  of

12  time.  I am not exactly sure when.  Being on the

13  job, yes, I became aware of that.

14    Q.    Can you think hard and tell me when it  was

15  that you became aware of that?

16    A.    Sometime maybe in 2000 I became aware of  it

17  just from conversation from my predecessor and  the

18  current captain that I worked under at the time, but

19  it wasn't a thing that I focused on because it

20  didn't happen on my watch.

21    Q.    How much do you know about that  complaint?

22    A.    Not a whole lot other than that it was a

1    A.   It depends, because it varies.  We have

2  GS-12s in SEA 10, which is the corporate office.

3  They have the authority to send things out once it

4  has been blessed maybe by their leadership.  Because

5  there is such a volume of information, it doesn't

6  necessarily have to be driven by grade level.

7    Q.   Mr. Randolph, when Ms. Lee first  approached

8  you about an accretion of duties  promotion, did you

9  give her any advice on how she  might obtain a

10  promotion?

11    A.   I don't know if it was advice.  But I  told

12  her the mechanics, as I understood them to be,  that

13  we would do a desk audit.  If she desired, we  could

14  do a desk audit.  If they found the position  to be

15  at the GS-13 level equivalent, that we would  have to

16  do one or two things.  We would have to  advertise

17  the position, which of course she could  compete for,

18  or we had the option of pulling some  duties to bring

19  the grade level down.

20    Q.   Suppose you had advertised the position  and

21  Ms. Lee had not been selected.

22    A.   Okay.

1    Q.    What would have happened to her?

2         MS. BRASWELL:  Objection.  It calls for

3    speculation.

4         You can answer.

5         THE WITNESS:  I will put it this way.  She

6    would have still been employed.  Historically we have

7    never had to relieve anybody or remove anybody

8    because of not having work.  Not in my  organization.

9         Here is what I do.  Okay.  If an

10   incumbent position is being advertised, I make sure

11   I have hold in abeyance a vacancy comparable to that

12   person's current position so if he or she doesn't

13   make it there is a fallback position for that

14   person.  That is just routine policy for any

15   situation like that for me.

16        BY MR. DAY:

17   Q.    What fallback position would there have

18   been for Ms. Lee if she had not been selected for a

19   new position?

20        MS. BRASWELL:  Objection.  It calls for

21   speculation.

22        You can answer.

1          THE WITNESS:  Obviously I would deal with

2     that when I am faced with it.  But I tend to always

3     have vacancies in my organization.  I have actually

4     lowered, did what we needed to do based on the work

5     load, upgraded accordingly, but we tend to always

6     have a vacancy and we do have the ability to do what

7     we need to do in this world.  It is a tradition I

8     have always had a vacancy.

9               BY MR. DAY:

10     Q.    In that conversation with Ms. Lee did you

11     tell her that?

12     A.    No.  Not the details under which I just

13     spoke to you, no, I did not.

14     Q.    Why not?

15     A.    Because she didn't ask about the process,

16     sir.

17     Q.    What did you expect her to do with the

18     information you gave her?

19     A.    What I really expected her to do?  You  are

20     asking my opinion now?

21     Q.    Yes.

22     A.    I really expected her to jump on the

1  opportunity and move forward.  But I would not play

2  a part in motivating or demotivating her in that.

3  That's what I expected.

4      Q.    When you say "jump on the opportunity," you

5  mean undergo the desk audit?

6      A.    Yes.

7      Q.    Did it occur to you that she might be

8  concerned about losing her job?

9      A.    We all are.  I guess I am a risk taker.  You

10  asked me my opinion.  I tend to be a risk  taker.  So

11  it is kind of hard -- I have to switch  over and put

12  myself in her situation.  Maybe she has reasons --

13          MS. BRASWELL:  Objection.  It would call

14  for speculation.

15          You can answer.

16          THE WITNESS:  Maybe she has reasons to  not

17  want to take that risk.  But I answered your

18  question from the standpoint of how I would react to

19  it.  From her point of view, I respect that, and I

20  didn't press it any further.  As I said, more than

21  once, I don't want to say many times, whatever you

22  want to do, it is up to you.  Whatever you want to

72

1    do.  I stood by that.

2              BY MR. DAY:

3        Q.    Did you consider her point of view when  you

4    gave her the information?

5        A.    Yes, I did.

6        Q.    And what was your understanding at the  time

7    of what her point of view was?

8        A.    She seemed a little bit uncomfortable,  but

9    that -- she seemed a bit uncomfortable, but I  wanted

10   her to know these are our options.  This is  how it

11   works.

12       Q.    Did it occur to you that if she was a

13   little bit uncomfortable that maybe she needed more

14   information?

15       A.    No.  Because I would tell her anything  she

16   asked me that's really, you know, within reason.

17       Q.    In your subsequent conversation with Ms.

18   Lee regarding desk audits, did you provide her with

19   any additional information at that time?

20       A.    The subsequent one, I felt the additional

21   information was confirmation from Ms. Lightfoot in

22   terms of what we could or could not do.  That was

1   basically in my mind my final determination of

2   providing her some data point to say, okay, it is

3   true indeed NAVSEA's policy right now is this.  And

4   that's what I was trying to validate because it was

5   brought to my attention again so I said, okay, I

6   need to validate this.  And that's when I brought in

7   Ms. Lightfoot.

8       Q.   Sometime in the first part of 2004 do you

9   recall a program analyst position being advertised

10  in SEA 63 IC 2?

11      A.   I am trying to narrow it down to make  sure.

12  Was there a title of the position?

13      Q.   This was the position which Kathy Ton was

14  eventually assigned to.

15      A.   Yes, sir.

16      Q.   So you recall that position being

17  advertised?

18      A.   Yes, because Mr. Settle left that  position.

19      MR. DAY:  I would like this marked as

20  Randolph No. 4.

21              (Randolph Exhibit No. 4 was

22              marked for identification.)

1  within her authority put them on hold.  Basically

2  stop, you are going to follow the

3  procedures, because NAVSEA dictates the guidelines

4  we set and they have been very successful for us,

5  and there had been some irregularities along the

6  way.  She froze that.  Stopped that.  Let's get

7  things in order here.

8        Meanwhile we had a personnel issue that

9  involved myself, the captain, involved Mr.

10  Ashenfelder, and one of his senior leaders, Mr.

11  George Watson, and Ms. Kathy Ton.  Ms. Ton was

12  emotionally in a very bad way.  So we decided, we

13  said, okay, what do we do about this.  We had to do

14  something because we could not leave her in the

15  environment she was in.

16        So the next best thing was, hey, we have

17  the other position over there.  It is a program

18  analyst position.  We are going to management direct

19  reassignment, approved by Captain Frederick.  We

20  moved her.

21    Q.    What kind of environment was she in?

22        MS. BRASWELL:  Objection to the extent  this

1          (Testimony resumes.)

2          BY MR. DAY:

3     Q.    When SEA 63 IC 2 was advertised, were the

4  employees told that the advertisement covered more

5  than one position?

6     A.    Were they told?  I didn't tell them that.

7     Q.    Were they informed in any other way that

8  this advertisement would cover more than one

9  position?

10    A.    No.

11    Q.    What countries or what region is 63 IC 2

12  responsible for?

13    A.    Which one?

14    Q.    63 IC 2?

15    A.    IC 2?  Some of the European countries,  if I

16  remember right.  Some European countries.

17    Q.    Which countries is 63 IC 1 responsible  for?

18    A.    Some of the ones, in this case Bahrain,

19  Philippines, some of your more, quote unquote,  Third

20  World countries.

21    Q.    Which countries does Ms. Lee work on?

22    A.    She is not a country manager.  You are

1  mixing --

2      Q.    As part her duties as a program analyst  is

3  she assigned countries to work on?

4      A.    I believe that's the way Mr. Seibel and  Mr.

5  Bussink have set it up.  I could not sit here  and

6  tell you exactly what countries she worked on.

7      Q.    At the time 63 IC 2 was advertised, you

8  knew Ms. Lee was interested in a promotion, isn't

9  that right?

10     A.    I knew she was interested in accretion of

11  duties in her current job, yes.

12     Q.    Did you ever encourage her to apply for  the

13  vacancy?

14     A.    No.

15     Q.    Why not?

16     A.    One, I don't normally do that a whole  lot.

17  I tell everybody, you see, if you want to  advance,

18  look for the announcements or the flyers.  The other

19  thing was our discussions were mainly  about

20  accretion of duties in the current job.  There wasn't

21  a whole lot -- in fact, I am trying to  pinpoint

22  where I was told I want to be something  else.  Okay.

1  Not until later on when there a  discussion with Mr.

2  Ashenfelder about the selection  of Ms. Vickie

3  Britton did I realize, whoa, that was  the first time

4  I encountered that.

5    Q.  Whose decision was it not to advertise  the

6  position in 63 IC 1?

7    A.  Not to advertise it?  What we did, I told

8  Ms. Lightfoot.  I said, okay, now we got to fill

9  this.  Because of the countries and what was going

10 on with them that I indicated earlier, I said we got

11 to fill this because we not only solve an internal

12 problem, but we got an international problem.  What

13 do we do?  What is the quickest way to get this

14 done?

15    She went to our AO, Wayne Richardson, who

16 said, hey, you already got a cert. Of qualified

17 applicants, okay.  Use that existing cert.

18    Q.  That was Mr. Richardson's advice?

19    A.  Yes.

20    Q.  And you followed his advice?

21    A.  Yes.

22    Q.  How often in your experience have you  used

1  an existing cert. For another job?

2      A.   I personally don't recall doing -- if you

3  are asking have I done anything like this particular

4  situation, no, I don't recall doing this, no.

5      Q.   Did it occur to you at the time that this

6  was a little bit unusual?

7      A.   No.  The purpose of even putting out the

8  flyer is to get a list of qualified applicants.

9  That's the purpose of even putting it out.  Okay.  So

10  we were looking -- were not looking -- I will  make

11  this very clear.  We are not looking for a  person to

12  work country A or country B.  We are  looking for a

13  person that is able, willing and will  work country

14  A, B, C, D, E and whatever country  comes up.  So

15  what we were looking for is the list  of qualified

16  applicants, the people who would best  satisfy the

17  requirements from the cert, and we had  that.

18      Q.   Are you trying to achieve fairness in the

19  promotion process?

20      A.   Always.

21      Q.   In that case, why not just send out  another

22  flyer?

84

1    A.    Time.

2    Q.    And why was time more of a factor in this

3    case than in any other case?

4    A.    The countries that I listed earlier and  the

5    requirements associated with them that I knew we were

6    working on, I needed somebody in that job  fast.  And

7    Mr. Ashenfelder -- Mr. Watson, I knew  wasn't a

8    hands-on kind of guy.  He really didn't  travel

9    anymore and I needed someone in that job.  And the

10   captain agreed.  Mr. Ashenfelder agreed that we got

11   to fill the position.

12        You see, the countries associated with

13   that, there was a need, okay.  That need spilled

14   over to support the United States Government.  That's

15   what drove it.  That's what drove the  priority.

16   Q.    Who has that job today?

17   A.    Wow.  It has gone through so many

18   iterations.  Ms. Britton left.  It is going to have

19   to come to me.  This is not something that I --

20   right now I don't recall.

21        MR. DAY:  Let's take a short break, if we

22   may.

1          But I will tell you generally what

2     happens is if some member of a panel, for instance,

3     his or her scoring in a particular area is way off

4     the mark or way different than, say, the majority,

5     then they discuss the findings and try to figure out

6     what it is that could bring them closer together.

7     Maybe somebody missed something that the others did

8     see.

9          He also would talk to me a little bit

10    about the responsiveness to the questions.  Generally

11    speaking, he will give me a little data  dump on,

12    comparatively speaking, how well the number one

13    candidate and the next closest candidate, how  well

14    they fared.  For instance, if he told me they  were

15    very close, then we are probably going to talk  a

16    little longer about how he decided between those  two

17    top very close candidates and how did he come to his

18    conclusion.  That's the type of discussion that  we

19    have.

20    Q.    How long did Ms. Britton stay in the job?

21    A.    Less than six months.

22    Q.    Why was that?