# EXHIBIT 4

UNITED STATES OF AMERICA

+ + + + +

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

+ + + + +

HEARING

+ + + + +

LYNETTE T. BOLLING,

    Complainant,

v

GORDON ENGLAND, SECRETARY,
DEPARTMENT OF THE NAVY,

    Agency.

EEOC No.
100-A1-7962X

Agency No.
DON 99-42912-006

Tuesday,
December 3, 2002

The above-entitled matter came on for hearing at 8:30 a.m. in Room 4400, 1333 Isaac Hull Avenue, Washington Navy Yard, SE, Washington, D.C., 20376.

BEFORE:

    WALLACE LEW,
    Administrative Judge

RECEIVED

DEC 12 2002

GEBHARDT

EXHIBIT _Lee 1_

Date: _5/8/06_

Reporter: David A. Kasdan, *RDR, CRR*

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1    with the representation I had in the motion.

2              JUDGE LEW:  Right, and this is in light of

3    the fact that I denied the motion by Mr. Gebhardt.

4    This is one and the same motion that I denied Mr.

5    Gebhardt's request, correct?  Is that not correct?

6              MS. ANDERSON:  Yes, that's correct.  You

7    denied his motion.  That's been the point that we've

8    been making all along with regard to the October 30th

9    order.  You denied the motion and then he turned

10   around -- well, it's already been amply discussed on

11   the record.

12             JUDGE LEW:  Okay, we'll go forth.

13             MS. ANDERSON:  Yes, we are.

14             JUDGE LEW:  Okay, Mr. Gebhardt?

15             MR. GEBHARDT:  Thank you.

16                    DIRECT EXAMINATION

17             BY MR. GEBHARDT:

18        Q    Ms. Lee, let me ask you this for the

19   record, are you African American?

20        A    Yes.

21        Q    Did you -- well, did you ever have any

22   conversation with Matthew Reynolds about the subject

23   of sexual harassment by Chris Chaikowski?

24        A    Yes.

25        Q    Okay.  And how did you find out about

1   Matthew Reynold's investigation?

2       A      He called me and asked me to speak with

3   him and I went down.  Then I had to write up something

4   saying what I've presented.  I wrote up what I

5   presented.  Actually, it's really not what I wrote up

6   but I had to accept it and that, because I signed it.

7       Q      What did you tell him?

8       A      Well, he wanted to know if I had had any

9   encounters with Ms. Chaikowski and I told him all that

10  I had and I had encounters.

11      Q      Okay, Ms. Lee, we've all agreed here at

12  the  hearing  to  only  discuss  sexual  harassment

13  incidents by Ms. Chaikowski from January 1, 1996 to

14  the present.  Are you following what I'm saying?

15      A      Yeah.

16      Q      Okay.  So did the statement that you gave

17  to Mr. Reynolds verbally did you cover any sexual

18  harassment  incidents  from  January  1,  '96  to  the

19  present?

20      A      Yes.

21      Q      Okay.  Did you cover any before January 1,

22  '96?

23      A      Yes.

24      Q      Okay, those are -- I'm just trying to

25  clarify, we don't want you to testify about the pre-

1      1996 incidents if there were any, okay?

2          A      Okay.

3          Q      All right, now as to what happened since

4      1996 to the present, did you tell Matt Reynolds when

5      you met with him about any examples of sexual, you

6      know, maybe if not harassment, sexual type things

7      involving Chris Chaikowski?

8          A      Yes.

9          Q      Okay, what do you remember telling him?

10         A      I told him about her touching me on my

11     butt.

12         Q      And when did that occur?

13         A      It was during a fire drill, I think

14     somewhere in the latter 1999, somewhere from October

15     something, October something 1999, somewhere from

16     October to the end of the year, 1999.

17         Q      Of 1999?

18         A      1999.

19         Q      Okay.

20         A      Or maybe 1998, '98/'99.

21         Q      Okay, so it could have been '98 or '99.

22         A      Right.

23         Q      Okay.  And when did -- you know, tell us

24     how this occurred. What was going on when she touched

25     you on your butt?

1    A    We were having a fire drill and everybody

2    was leaving the building and we were leaving the

3    building.  And she touched me on my behind and one co-

4    worker saw it and she teased me about it for the rest

5    of the day, of course, but --

6    Q    Okay.  Were people exiting the building,

7    you know, fast, like they do in fire drills?

8    A    Yes, yes.

9    Q    Okay.  So how -- I mean, where did this

10   happen?  Did it happen in a hallway or a stairwell?

11   A    It was in the office.  We were just

12   leaving the office.

13   Q    Oh, you were just leaving the office.

14   A    We were leaving the office.  It was in the

15   office.  We were not in the hallway.  It was in the

16   office.

17   Q    And she touched you on the butt.

18   A    Yes.

19   Q    All right, was it kind of like a friendly

20   touch?

21   A    Well, I don't know because she was behind

22   me.  I don't know if it was a friendly touch or what.

23   Q    Who was the co-worker who saw this happen?

24   A    Oh, gosh, do I have to bring somebody else

25   into this?

1   Q    I think you should.

2   A    Rochelle Austin.

3   Q    Rochelle Austin?

4   A    Yes.

5   Q    Okay, she's the one who teased you the

6   rest of the day about it?

7   A    Yes.

8   Q    Okay, there's a written statement and let

9   me direct you to this book here and open it to Tab 10.

10  Take your time and under Tab 10 go beyond the report

11  narrative to Attachment 2.  It's at the bottom right,

12  Attachment 2.  It's right up front.

13  A    Up front?

14  Q    You're close, you're close.  Just keep

15  going.

16  A    Okay.

17  Q    Okay, Attachment 2.  Do you recognize that

18  statement?

19  A    Yeah.

20  Q    Okay, and is that the statement that you

21  signed for Matt Reynolds?

22  A    Yes.

23  Q    Is that your signature?

24  A    Yes.

25  Q    Okay, and did you sign it on January 20,

1      1999?

2              A      Yes.

3              Q      Okay.  Okay, Ms. Chaikowski touched you on

4      the butt.

5              A      It was prior to this.

6              Q      Prior to that, so it must have been '98.

7              A      Yes.

8              Q      Okay.

9                     JUDGE LEW:  So I take it you're just doing

10     this for refreshing the memory?

11                    MR. GEBHARDT:  Yes.

12                    JUDGE LEW:  Okay, not for admission.

13                    MR. GEBHARDT:  Well, I'm going to.

14                    JUDGE  LEW:    Well,  I  mean,  you  know,

15     normally you're supposed to get the exhibit admitted,

16     then go into the substance.

17                    MR. GEBHARDT:  Okay, I move to get this

18     document admitted as Complainant's Exhibit 13.

19                              (The document referred to was

20                              marked for identification as

21                              Complainant Exhibit No. 13.)

22                    MS. ANDERSON:  The Agency objects on the

23     grounds that it includes incidents and events that are

24     outside the scope of this proceeding.

25                    MR. GEBHARDT:  I would modify my motion

1274

1    for admitting this document by saying that I'd like

2    the text of it to be admitted but excluding any

3    incident that occurred prior to January 1, 1996. Any

4    text referring to that should be excluded.

5              JUDGE LEW:  I guess what I would suggest

6    is that you delete the recommended language and then

7    let the Agency counsel decide whether that's adequate

8    or not. I mean, perhaps we could take Ms. Lee's copy

9    or whatnot.

10             MS. ANDERSON:  The Agency has a copy.

11   Would you just cross through the lines that should be

12   redacted?

13             MR. GEBHARDT:  Judge, given the Agency's

14   objection on this, I don't wish to pursue it.

15             JUDGE LEW:  Okay.  So I guess you can

16   close the exhibit, is that correct?

17             MR. GEBHARDT:  That's fine.

18             JUDGE LEW:  Okay.

19             BY MR. GEBHARDT:

20       Q    When Ms. Chaikowski touched you on the

21   butt during this fire drill, what was your reaction?

22       A    I was -- I really didn't have one until

23   Rochelle started teasing me. Then I kind of --

24       Q    You were --

25       A    -- because I had been used to it, so it

 1    was -- she was always touching people, me, so it was

 2    nothing unusual for me to -- for to have her touch me.

 3              MR.  GEBHARDT:    All  right,  I  have  no

 4    further questions.  Thank you very much.

 5              MR. GEBHARDT:  Okay, Ms. Anderson?

 6                   CROSS EXAMINATION

 7              BY MS. ANDERSON:

 8         Q    Ms. Lee, you've testified on direct that

 9    Ms. Chaikowski touched you on your behind during a

10    fire drill, correct?

11         A    Yes.

12         Q    Okay.  Did this touching occur as you were

13    leaving the office during the fire drill?

14         A    Yes, it did.

15         Q    Wasn't Ms. Chaikowski a Fire Warden or one

16    of the people assigned to, I don't know, usher people

17    out or shepherd people out of the office?

18         A    I believe so.

19         Q    During fire drills, okay.  So as you were

20    leaving  the  office  during  the  fire  drill,  Ms.

21    Chaikowski's role was to make sure the people got out

22    of the office; isn't that correct?

23         A    Yeah.

24         Q    And during the process of making sure that

25    you got out of the office, she touched you on your

1276

1    behind; is that your testimony?

2        A    No.

3        Q    What happened?

4        A    She touched me on the butt, that's it.

5    She -- it didn't have nothing to do with me getting

6    out of the office.

7        Q    Okay.  Well, you said that you were going

8    out of the office.  There was a fire drill, correct?

9        A    Correct.

10       Q    And  you  were  leaving  the  office  in

11   response to the fire drill.

12       A    Correct.

13       Q    Correct?    Where   was   Ms.   Chaikowski

14   standing  in  relation  to  you  when  this  touching

15   occurred?

16       A    I  don't  recall  where  she  was  standing,

17   probably behind me.  She had to be in order to touch

18   me on the butt.

19       Q    Do you recall what she was doing that --

20   well,  during  the  fire  drill  itself,  do  you  recall

21   what, if anything, she was doing relative to helping

22   people get out of the office?

23       A    No.  She was -- no.

24       Q    Now at the time this incident occurred,

25   you didn't feel threatened by it, did you?

1     A     No.

2     Q     Okay.  You didn't complain about the

3   incident to management when it occurred, did you?

4     A     No.

5     Q     And at the time you thought the touching

6   was rather benign; isn't that correct?

7     A     Yeah.

8     Q     Didn't you at the time, Ms. Lee, attribute

9   Ms. Chaikowski's alleged touching on your behind to

10  her friendliness?

11    A     Not necessarily.

12    Q     Okay.  I believe Mr. -- Mr. Gebhardt

13  showed you an exhibit in this book.  I can't recall

14  what exhibit it was.

15         JUDGE LEW:  It was Tab 10.

16         MR. GEBHARDT:  Tab 10, Attachment 2.

17         JUDGE LEW:  Attachment 2.

18         BY MS. ANDERSON:

19    Q     Attachment 2, would you take a look at

20  that?

21    A     I just closed the book when you told me to

22  shut it.

23    Q     Okay, okay.

24    A     Yes.

25    Q     Now, directing your attention to the last

1    two sentences in the first paragraph, the statement

2    reads, "Although I felt uncomfortable about these

3    incidents, I did not then nor now feel threatened by

4    Ms. Chaikowski.    She is a friendly person and I

5    attribute this behavior to that friendliness".  Do you

6    recall giving that statement?

7            MR. GEBHARDT:  Objection.   That document

8    is not admitted.

9            MS. ANDERSON:  This is for -- you don't

10    have to admit it for impeachment.

11            JUDGE LEW: Mr. Gebhardt, are you going to

12    respond to that?

13            MR. GEBHARDT:  I think she's questioned

14    her about the document and I don't think there's

15    impeachment here.  So I think if they want to admit

16    the document, they should go ahead and admit it.

17            JUDGE LEW:  Ms. Anderson?

18            MS. ANDERSON:  We don't have to admit a

19    document for impeachment.

20            JUDGE LEW:  Under these circumstances, I

21    believe I'm going to overrule the objection especially

22    because Mr. Gebhardt, I think you were able to have

23    her look at the document some before I actually said,

24    "Well, hold it, we've got to get this admitted", so I

25    think in fairness to the Agency, you were able to

1279

1    elicit some testimony with the witness looking at the

2    document and I do agree with the Agency, too, about

3    impeachment as well.  So I'm going to overrule.  So

4    continue with the question, Ms. Anderson.

5              BY MS. ANDERSON:

6         Q    Okay, my question was and I read the last

7    two sentences of the first paragraph, and my question

8    is, do you recall making that statement?

9         A    Yes, yeah, I do.

10        Q    So you did attribute Ms. Chaikowski's

11   touching you on your behind to her friendliness?

12        A    Not necessarily.

13        Q    Now, you have described Ms. Chaikowski as

14   a friendly person, correct?

15        A    Yes.

16        Q    And what did you mean by that?

17        A    She was friendly.  She was a friendly

18   person.  What is friendly?

19        Q    Would you describe her as a touchy feely

20   person?

21        A    Touchy feely and what do you mean by

22   touchy feely?  A feely person, yes.

23        Q    Well, a person that would just touch

24   people on the shoulders, on their --

25        A    She was a touchy person, yes.

1    Q      She was a touchy person, okay.  Was it a

2    practice in the office to hug and kiss on special

3    occasions?

4    A      No.

5    Q      Now, the statement that you signed in

6    January of 1999 -- I'm going to ask you to close the

7    book for just a second.  In the statement that you

8    signed in January of 1999, do you recall discussing an

9    incident that allegedly occurred -- yeah, that

10   allegedly occurred between Ms. Chaikowski and another

11   person in the bathroom?

12   A      Well, only what I heard, only what was

13   told to me.

14   Q      And who told you about the incident?

15   A      Ms. Bolling told me about an incident that

16   she had in the rest room.

17   Q      And do you recall what she told you about

18   that incident?

19   A      No, I don't recall that.

20   Q      Do you recall how soon after the incident

21   occurred that Ms. Bolling talked to you about it?

22   A      No, I don't.

23   Q      If you are able to refer to your

24   statement, do you think that might help you refresh

25   your memory?

1    A    If I look at it, yeah, I guess.

2    Q    I'm going to ask you again to turn to Tab

3    10, Attachment 2, okay, and the second paragraph of

4    that statement.  Are you reading that?

5    A    Yeah.

6    Q    Okay.  It says here that this person, and

7    I'm assuming we're talking here about Ms. Bolling,

8    told you that Ms. Chaikowski tried to kiss her in the

9    bathroom and you said it was soon afterwards that she

10   told me, either the day -- that day or the next day.

11   Does that help refresh your memory as to when Ms.

12   Bolling talked to you about the incident?

13   A    It was either that day or the next day.

14   If I recall correctly, it was that day, the day that

15   it happened.

16   Q    And when Ms. Bolling told you about this

17   incident, she didn't seem upset to you, did she?

18   A    No, she didn't.

19   Q    In fact, she seemed to be joking about it;

20   isn't that correct?

21   A    Yeah.

22   Q    And what led you to believe that Ms.

23   Bolling was joking about the incident?

24   A    Because she was laughing.

25   Q    And when Ms. Bolling told you about the

1  incident, soon after it occurred, she didn't say

2  anything about wanting to report it, did she?

3      A    Why would she need to tell me that?  No,

4  she did not.

5      Q    How long have you known Ms. Bolling?

6      A    I would say since '91/'92.  Actually, I

7  knew of her before that, but --

8      Q    Okay, would you describe yourselves as

9  friends?

10     A    In the office, yeah, not outside of the

11 office.  We have no communication outside of the

12 office.

13     Q    And how long have you known Ms.

14 Chaikowski?

15     A    Probably about 20 years.

16     Q    Would you say that you and Ms. Chaikowski

17 are friends?

18     A    No.

19     Q    Do you still work with Ms. Bolling?

20     A    Yes.

21     Q    Do you want to maintain your office

22 relationship or friendship with Ms. Bolling?

23     A    Why not?

24     Q    Is that yes?

25          JUDGE LEW:    You should answer the

1    question.    Ms.  Anderson  is  the  one  asking  the

2    questions, so please answer them.

3                    THE WITNESS:  All right.

4                    BY MS. ANDERSON:

5          Q      Is that yes?

6          A      Yes.

7          Q      Now you say that you no longer -- that as

8    of 2000 Ms. Chaikowski was no longer supervising you,

9    correct?

10         A      I don't remember when she left NAVSEA.

11         Q      But it's been at least a year or so since

12    she supervised you.

13         A      Yes.

14         Q      Okay, and do you see her at all now, Ms.

15    Chaikowski?

16         A      On occasions I run across her.

17         Q      Have you spoken to Ms. Bolling about this

18    case?

19         A      No.

20         Q      You have not.

21         A      No.

22                MS. ANDERSON:  Okay, no other questions.

23                JUDGE LEW:  Okay, Mr. Gebhardt?

24                MR. GEBHARDT:  Yes, just a few.

25                    REDIRECT EXAMINATION

1    BY MR. GEBHARDT:

2        Q    You mentioned that you have a good

3    relationship with Ms. Bolling in the office, correct?

4        A    Yes.

5        Q    Okay, how -- what are Ms. Bolling's main

6    characteristics in the office?

7        A    Loving, giving, she's just a beautiful

8    person.  Everybody likes her.

9        Q    Is she considered a good worker?

10       A    Yes.

11           MS. ANDERSON:  I'm going to object because

12   this is beyond the scope of cross.

13           JUDGE LEW:  Well, I mean, I think she

14   already answered the question.

15           MS. ANDERSON:  Move to strike.

16           JUDGE LEW:  So --

17           MR. GEBHARDT:  I don't believe it's -- she

18   talked to her about her relationship with Ms. Bolling

19   at work and so I'm developing that with her.

20           JUDGE LEW:  Ms. Anderson.

21           MS. ANDERSON:  Your friendship -- I'm

22   sorry, her friendship with Ms. Bolling at work is

23   sufficient to go into areas concerning her -- her work

24   habits.

25           MR. GEBHARDT:  How she views Ms. Bolling.

1  Do you want to strike that she just said that Ms.

2  Bolling is loving, caring and a beautiful person?  Is

3  that what you want to strike?

4           MS. ANDERSON:  That's fine.

5           MR. GEBHARDT:  Oh, that's okay?

6           MS. ANDERSON:  That's fine.  I don't want

7  to go beyond -- I don't want to go into issues

8  regarding how she --

9           MR. GEBHARDT:  The teamwork and all that,

10  that's --

11           MS. ANDERSON:  Exactly, because that's

12  beyond the scope -- beyond the scope of cross.

13           JUDGE LEW:  Right.

14           MR. GEBHARDT:  Ms. Anderson opened the  to

15  this.  She opened the  to her relationship at work

16  with Ms. Bolling.

17           JUDGE LEW:  Well, it seems to me that --

18           MR. GEBHARDT:  In order to undermine her

19  testimony saying, do you want to continue to be

20  friends and now we want to find out what she thinks of

21  Ms. Bolling, why are they friends.

22           JUDGE LEW:  But I think there's a little

23  difference between Ms. Bolling's relationship with the

24  witness and her relationship with other people who she

25  works with.  And I think that's what Ms. Anderson was

1   objecting to.

2           MR. GEBHARDT:  I don't get it.

3           MS. ANDERSON:  That's correct.

4           MR.  GEBHARDT:  I  don't  get  the

5   distinction.

6           JUDGE LEW:  Well, I mean --

7           MR. GEBHARDT:  I mean, in the witness'

8   mind, Ms. Bolling is loving, caring and a beautiful

9   person and a good worker and they aren't friends

10  except at work.  So obviously, this is the basis of

11  their friendship.

12          JUDGE LEW:  Right, but I thought the last

13  question was more directed to the witness' perception

14  in terms of a relationship with others, other than

15  herself.  So in that sense --

16          MR. GEBHARDT:  Maybe I can move on.

17          JUDGE LEW:  I mean, I agree with the

18  Agency on this one.  So I'm going to sustain the

19  objection.  That doesn't mean you can't ask some more

20  questions and try to get at what you're trying to get

21  at a different way but certainly subject to objection.

22          MR. GEBHARDT:  Okay.

23          BY MR. GEBHARDT:

24      Q       Could you explain to Judge Lew and the

25  Agency attorneys why you consider Ms. Bolling a good

1    friend at work?

2        A    Because Ms. Bolling is the type of person

3    you could go to when you needed help.  You could

4    always go to Ms. Bolling.  There's been times when I -

5    - say like for machines we have to use the financial

6    systems and lots of times, I get my password suspended

7    and I needed somebody to pull a report for me.  I

8    could always go to Ms. Bolling to get that help and

9    any other help that I needed.

10       Q    Is  your  friendship  at  work  with  Ms.

11   Bolling  based  upon  how  you  both  deal  with  the

12   atmosphere in the office?

13           MS. ANDERSON:  That's a leading question

14   and we object.

15           MR. GEBHARDT:  I can rephrase it.

16           BY MR. GEBHARDT:

17       Q    Do you and Ms. Bolling, as part of your

18   friendship, talk about the office atmosphere?

19       A    Absolutely.

20       Q    And  what  is  the  substance  of  your

21   conversation with her?

22           MS. ANDERSON:  Again, I'm going to object

23   because I do believe these questions clearly go beyond

24   the scope of the cross examination.  Ms. Lee was

25   proffered as a rebuttal witness to address the patting

1288

1  on the butt incident and that's it.  And the cross

2  really did not go beyond that.

3              MR. GEBHARDT:  Your Honor --

4              MS. ANDERSON:  So we're now venturing into

5  areas that have absolutely nothing to do with the

6  purpose for which she was proffered and go well beyond

7  the scope of cross.

8              MR. GEBHARDT:  Your Honor, let me repeat

9  one more time, Ms. Anderson, not I, asked Ms. Lee is

10  she were friends at work with Ms. Bolling and that

11  could lead the trier of fact or someone reviewing the

12  record some day up the line or down the line the idea

13  that Ms. Lee is testifying out of friendship for

14  Carolyn Bolling and it's only fair for us to be able

15  to probe a little bit into why they are friends at

16  work and Ms. Anderson opened the .

17              JUDGE LEW:  Well, I don't know why you

18  can't just ask the question, why they're friends.  I

19  mean, I can tell where you're going, Mr. Gebhardt, but

20  I think the Agency has got a legitimate objection.  I

21  mean, I think the scope of the cross was, okay, is why

22  perhaps are their friends, certainly that's within the

23  scope but I don't think you should be going beyond

24  like as it effects other people.  It should be two

25  individuals.

1  MR. GEBHARDT:  Why can't I ask her about

2  whether they're bonded as friends to cope with the

3  office atmosphere which is what I'm being prevented

4  right now from asking?  Why isn't the  open to that

5  question?

6  JUDGE LEW:  Well, I'll let Ms. Anderson

7  respond and then I'm going to -- okay, Ms. Anderson?

8  MS. ANDERSON:  I don't have a response.

9  I think that the Agency has already articulated or

10  expressed why it believes that the scope of its cross

11  examination did not venture into areas related to any

12  perceived  hostilities  in  the  office  or  office

13  atmosphere.   The  question  was,  do  you  have  a

14  friendship with Ms. Bolling.  The answer was I have an

15  office friendship with her, nothing beyond that.  So

16  I don't think that the narrow scope of that question

17  allows Mr. Gebhardt to venture into areas that have

18  nothing to do with a friendship, vis-a-vis, Ms. Lee

19  and Ms. Bolling.

20  JUDGE LEW:  I think I agree with the

21  Agency on this one.  I mean, Mr. Gebhardt, you could

22  have proffered her for -- on direct for what you're

23  trying to do on redirect and you didn't do it.  So I'm

24  going to sustain the objection.

25  MR. GEBHARDT: Okay, I'll move along then.

1    I hate to bother you again, Ms. Lee, but

2  could you turn to Tab 10, Attachment 2?    And while

3  she's doing that, I'd like to renew my motion to have

4  this document admitted into evidence and I figured out

5  what should be excised pursuant to our joint agreement

6  to limit from the hearing anything that deals with

7  sexual harassment prior to January 1, 1996.

8         JUDGE LEW:    Well, I guess, like I

9  suggested before, if you could excise what you propose

10  to excise and then let the Agency look at it so they

11  can.

12         MR. GEBHARDT:   I can read the sentences

13  that should be excised.

14         MS. ANDERSON:   No, because then those

15  sentences would become part of the record.  Just black

16  them out and we can submit the redacted copy of this

17  exhibit.

18         MR. GEBHARDT:   Well, I'd like to read

19  them, it would be easier.

20         JUDGE LEW:  Well, I think it would be --

21         MS. ANDERSON:  Objection.

22         JUDGE LEW:   Right, I agree with the

23  Agency, you would be sort of doing it in the back ,

24  shall we say.  If you want, we can take a brief break.

25  You can redact what you propose to redact.  Then let

1    the Agency see it and they can respond.

2              MR. GEBHARDT:  It's just material from the

3    first five lines that deals with the prior incidents.

4    Yes, we should still be on the record because I'm

5    doing this.

6              MS. ANDERSON:  Okay, and can we just move

7    to strike Mr. -- this redaction is fine with the

8    Agency.  Can we just move to strike Mr. Gebhardt's

9    last commentary about what he wished to redact?

10             MR. GEBHARDT:  I think the record should

11   be clear on what I wish to redact.

12             JUDGE LEW:  Yeah, I mean, I have -- I'm

13   going to agree with Mr. Gebhardt on that.  I mean, it

14   was a very general statement.  He didn't go into

15   anything specific.

16             MR. GEBHARDT:  If you happen to look at --

17             JUDGE LEW:  Okay, let me see, in view of

18   this, now --

19             MS. ANDERSON:  What I would propose that

20   we do just to make it clearer, we will just get a

21   black magic marker and go over the areas that Mr.

22   Gebhardt crossed out.

23             MR. GEBHARDT:  I disagree with that.  It's

24   already lined out.

25             MS. ANDERSON:  Then we have a problem with

1    this.

2              JUDGE LEW:  Okay, I think I mean --

3              MS. ANDERSON:  And we would object.

4              JUDGE LEW:  -- I agree with the Agency, it

5    should  be  redacted  and  you're  the  one  who  is

6    proffering,  Mr. Gebhardt,  so  I  mean,  if  you  still

7    disagree,  I  guess,  you  know,  it  doesn't  have  to  be

8    admitted, but --

9              MS. ANDERSON:  We can go off the record

10   and get a black marker and let him mark it.  Again, at

11   that point, the Agency would have no objection to this

12   document being entered into the record.

13             JUDGE LEW:  The other alternative is, you

14   know, if you wanted to preserve it for appeal, given

15   what you've done, I could basically reject it and it

16   would  get  in  the  record  that  way  for  purposes  of

17   appeal.  You know, rejected exhibits are part of the

18   record.

19             MR. GEBHARDT:  Well, that's not the most

20   appealing offer.

21             JUDGE LEW:  Okay, well, I mean --

22             MR. GEBHARDT:  Here's the way to break the

23   impasse.  We've very close to an agreement on this, so

24   since the Agency is the one that's insisting on the

25   redaction  to  be  even  more  redacted  than  it  is

1    currently, I suggest that they use the black magic

2    marker so that they can bury this evidence. Let them

3    do it.

4                JUDGE LEW:  Okay, Ms. Anderson?

5                MR. GEBHARDT:  If they want to cover it

6    up, it's okay with me.

7                MS. ANDERSON:  No objection.  I do object

8    to the characterization that the Agency is engaging in

9    a coverup or trying to bury evidence.

10                MR. GEBHARDT:  You're doing a good job

11    with the magic marker.

12                MS. ANDERSON:  Yes, I'm just going over

13    the areas that you've already crossed off.

14                MR. GEBHARDT:  You got rid of the word

15    "in", that should be "in" here.  Well, anyway.

16                JUDGE LEW:  Did you want another copy to

17    do --

18                MR. GEBHARDT:  I don't know if we should

19    make Ms. Anderson, you know, do this exercise again.

20                MS. ANDERSON:  Well, you could always do

21    the honors.

22                MR. GEBHARDT:  We'll go with this one,

23    even though it's missing a word.

24                JUDGE LEW: Okay, so there is no objection

25    now to admission of that particular exhibit?

1    MS. ANDERSON:  No, there's no objection.

2    JUDGE LEW:  Okay, if you don't mind, Mr.

3    Gebhardt, I'll just sit there.  What is this Exhibit

4    13?

5    MR. GEBHARDT:  13, yes.

6    JUDGE LEW:  The statement of Brenda Lee

7    dated January 20th, 1999 one page, came from the

8    memorandum from Matthew Reynolds to Jesse Atkins, an

9    attachment to.  So that's Complainant's Exhibit 13.

10   Okay, do you wish to continue?

11                      (The document referred to having

12                      been previously marked for

13                      identification as Complainant

14                      Exhibit No. 13 was received in

15                      evidence.)

16   MR. GEBHARDT:  Okay, we'll have to make

17   copies of this later.

18   BY MR. GEBHARDT:

19   Q    So, Ms. Lee, if you could take a look at

20   this document, please.  Could you tell us how this

21   document came to be composed?

22   A    I received a call from Matthew Reynolds

23   asking me to come down to his office, he wanted to

24   speak with me and when I got there, he asked me about

25   the incidents, had I had any incidents with Ms.

1    Chaikowski ever touching me and so forth and so on,

2    and I told him about three incidents.  So he asked me

3    to -- he wrote it up, he actually wrote up what I said

4    and he didn't -- and he didn't make the correct

5    changes anyhow, but -- and then he had me to sign it

6    and I signed it.

7         Q    Is there anything about this document and

8    let me show you the -- where is the one that has been

9    redacted by the Agency?  So look only at this one that

10   has all the black ink at the top, the redacted

11   version.  Is there anything in the text that you can

12   read that you would like to clarify or correct at this

13   time?

14        MS. ANDERSON:  Can we just clarify what

15   the witness -- that she's unable to read the blacked

16   out portions.

17        THE WITNESS:  I'm not reading it.  Well,

18   it's everything in here actually as far as me not at

19   all feeling uncomfortable and her doing this as

20   friendliness.  I don't believe that it was done as a

21   friendly gesture because of other incidents since this

22   and the things that's happened to other people that I

23   have seen and well, that's the only thing other than

24   that, now today, I don't believe that these things

25   were done as a friendly gesture because of me now

1    knowing for sure who this person is.

2            BY MR. GEBHARDT:

3        Q    Okay.  Do you remember when Ms. Anderson

4    was talking to you about Ms. Bolling joking about

5    this?

6        A    Uh-huh.

7        Q    Has Ms. Bolling ever joked when she was

8    embarrassed?

9        A    Yeah.

10       Q    She does?  Could she have been joking

11   because she was embarrassed?

12           MS. ANDERSON:  That's a leading question,

13   objection.

14           THE WITNESS:  I don't --

15           JUDGE LEW:  Excuse me.  Don't answer a

16   question when there's an objection.  Maybe you should

17   rephrase the question, Mr. Gebhardt.

18           MR. GEBHARDT:  Uh-huh.

19           BY MR. GEBHARDT:

20       Q    Do you think that Ms. Bolling joking about

21   this incident had anything to do with embarrassment?

22       A    Very -- yes, it could have, only because

23   I do that myself.

24       Q    But you know Ms. Bolling pretty well from

25   your relationship at work, right?

1297

```
 1        A      Right, uh-huh.

 2        Q      So have you known there to be specific

 3   times when Ms. Bolling joked or laughed when she was

 4   embarrassed about something?

 5        A      Yeah.

 6               MR.  GEBHARDT:   Okay, nothing further,

 7   thank you.

 8                    RECROSS EXAMINATION

 9               BY MS. ANDERSON:

10        Q      Did Ms. Bolling tell you that she was

11   feeling embarrassed? When she discussed this incident

12   with you the day -- either that day or the next after

13   it occurred, did she tell you that she --

14        A      Well, it wasn't just that day that she

15   discussed this.

16        Q      But I'm focusing on that day.  Did she

17   tell you that she felt embarrassed on that day?

18        A      No, she did not.

19        Q      Do you -- do you know for sure that when

20   you state here that she was joking that she did it

21   because she was embarrassed?  Do you know that for

22   sure?

23        A      Knowing her as I do, I would say yes.

24        Q      You do know that for sure.

25        A      Yes.
```

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    MS. ANDERSON:  Okay, no other questions.

2    JUDGE LEW:  Mr. Gebhardt?

3    MR. GEBHARDT:  Nothing further.

4    JUDGE LEW:  Okay, Ms. Lee, thank you very

5    much for testifying today.  Please do not discuss your

6    testimony with anybody outside this room, including

7    Ms. Bolling.

8    THE WITNESS:  Okay.  You don't have to

9    worry.

10    (The witness was excused.)

11    JUDGE LEW:  Okay, I guess off the record.

12    (Off the record.)

13    JUDGE LEW:  Back on the record.  Ms.

14    Russell,  my  name  is  Wallace  Lew.  I'm  an

15    Administrative  Judge  with  the  Equal  Employment

16    Opportunity Commission assigned to conduct the hearing

17    in  this  case  involving  the  complaint  of  Carolyn

18    Bolling against the Department of the Navy.  Are you

19    prepared to go under oath?

20    MS. RUSSELL:  Yes, sir.

21    JUDGE LEW:  Please raise your right hand.

22    Whereupon,

23    TRINITA RUSSELL

24    was called as a witness and, having been first duly

25    sworn, was examined and testified as follows:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com